**Quang BUI, Petitioner–Appellant,**

v.

**Michael HALEY, Commissioner, Alabama Department of Corrections, et al., Respondents–Appellees.**

No. 00–15445.

United States Court of Appeals, Eleventh Circuit.

Feb. 19, 2003.

---

Randall Scott Susskind (Court-Appointed), Equal Justice Iniative of Alabama, Montgomery, AL, for Bui.

Beth Jackson Hughes, Montgomery, AL, for Respondents–Appellees.

Before TJOFLAT, BLACK and
WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

On February 26, 2002, we denied the
State's petition for rehearing but retained
jurisdiction of the case. We now withdraw
the prior opinion of this panel, *Bui v.
Haley,* 279 F.3d 1327 (11th Cir.2002), and
substitute this opinion in its place.

Petitioner in this case, an Alabama pris-
on inmate, seeks a writ of habeas corpus
setting aside his 1986 conviction for capital
murder.[1] The United States District
Court for the Middle District of Alabama
denied the writ, rejecting, among other
claims, petitioner's assertion that the
Montgomery County District Attorney
who prosecuted his case failed to present
any race-neutral reasons for striking nine
blacks from the venire summoned for peti-
tioner's trial, thereby denying petitioner
equal protection of the law as recognized
by the United States Supreme Court in
*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct.
1712, 90 L.Ed.2d 69 (1986).[2] We conclude

that the State failed to carry its burden
under *Batson,* a failure which violated peti-
tioner's right to equal protection. We
therefore reverse the district court's ruling
and direct the court to issue a writ of
habeas corpus conditioned on the State's
right to retry petitioner.

## I.

### A.

Petitioner, Quang Ngoc Bui, a Vietnam-
ese citizen, arrived in the United States in
1975 and married an American woman,
with whom he had three children. On
April 9, 1986, a Montgomery County grand
jury indicted Bui for the capital murder of
these three children.[3] Bui was arraigned
in the Montgomery County Circuit Court
on April 15 and entered a plea of not
guilty. He was scheduled to go to trial on
June 9, 1986. On May 8, over a month
before the scheduled trial date, Bui moved
the court for an "order enjoining the pros-
ecutor from using his peremptory chal-
lenges to systematically exclude blacks
from the jury." His motion recited the
following facts:

---

1. The petitioner was indicted and convicted
for "Murder wherein two or more persons are
murdered by the defendant by one act or
pursuant to one scheme or course of con-
duct." Ala.Code § 13A–5–40(a)(10).

2. In addition to his *Batson* claim, the district
court granted petitioner a certificate of ap-
pealability on *twenty-seven claims of constitu-
tional error.* In his brief on appeal, however,
petitioner presented only two claims, his *Bat-
son* claim, and a claim that the trial court, in
examining the venire prior to the commence-
ment of jury selection, failed to question the
prospective jurors on racial bias as (according
to petitioner) *Turner v. Murray,* 476 U.S. 28,
36–37, 106 S.Ct. 1683, 1688–89, 90 L.Ed.2d
27 (1986), required it to do. The district
court denied this claim on the grounds that
the questions petitioner posed were overly
broad and that the topic of racial prejudice

was sufficiently covered by the questions actu-
ally posed. We find no error in the ruling.
In addition to these grounds, the district court
could have rejected petitioner's claim on the
ground that petitioner's counsel, themselves,
had ample opportunity to examine the venire
on the matter of racial bias. Prior to the
commencement of voir dire, the court told
counsel that voir dire would proceed as fol-
lows: "I am going to voir dire the jury gener-
ally and then I am going to send the whole
panel out and then bring back twelve at a
time and allow the lawyers to ask a few
questions of what they don't think I have
thoroughly asked to their satisfaction."

3. At the time of their deaths, the children, Phi
Ngoc Bui, Julie Quang Bui and April Nicole
Bui, were eight, six, and four years of age,
respectively.

1. The Defendant is a non-white.

2. The prosecutor in this county[, James Evans,] routinely utilizes his peremptory challenges to systematically exclude blacks from the jury panel.

3. The prosecutor will no doubt follow that pattern in this case and utilize his peremptory challenges to systematically exclude blacks from the jury panel so as to insure that the Defendant will be tried by an all-white jury.[4]

The court heard Bui's motion on June 9, moments before jury selection began. Richard Shinbaum and William Abell appeared for the defendant; James Evans, the Montgomery County District Attorney, appeared for the State, assisted by Eleanor Brooks and Randall James, assistant district attorneys. The following exchange occurred when the court took up the motion:

*Court:* [Turning now to] Defendant's motion to enjoin the prosecutor from utilizing his peremptory challenges to systematically exclude blacks from the jury panel. I don't see where that would happen, but everybody is aware of the law on this particular issue now.

*Evans:* Definitely.

*Court:* I grant the motion to systematically exclude, but if there are reasons, I will hear those reasons later.

*Brooks:* We intend to cite Batson v. Kentucky.

. . .

*Evans:* Let me put in the record that the defendant is of oriental distraction; he is not black.

*Court:* Well, he is a minority.

*Shinbaum:* That's not a requirement, that he be black to raise the motion.

After disposing of Bui's motion and some other pre-trial matters, jury selection began. We describe the jury selection process in considerable detail because the *Batson* issue cannot properly be resolved without first understanding the circumstances in which it arose.

The court summoned forty-nine venire persons for Bui's case. Jury selection took approximately three and a half hours, without a single recess for the court, counsel, or the defendant. The court began by questioning all forty-nine venire persons together, using questions submitted by the parties and some of its own. The court then sent the venire to another room, informing the jurors that it would call them back to the courtroom twelve or thirteen at a time. After being brought to the courtroom, each group was questioned by the court and counsel. Evans did all of the questioning for the State.

The court entertained challenges for cause in chambers after all forty-nine venire persons had been examined as described above. Ten were excused, reducing the qualified venire to thirty-nine persons. (Nine of these ten remained with the venire, unaware of the proceedings in chambers or that they had been excused; the tenth, a police officer, was permitted to leave the courthouse.) After the clerk informed the court that an odd number of qualified venire members remained, the court ordered that the

---

**4.** As we show in the text *infra,* the method the trial court employed to select the jury did not involve the use of "peremptory challenges" in the sense that a specific number of peremptory challenges were awarded to the respective parties for use as they saw fit. *See, e.g.,* Fed.R.Crim.P. 24(b). Rather, the parties here were presented with a qualified venire of thir-

ty-eight persons, following the granting of challenges for cause, and then were required to reduce that number to the twelve individuals who would constitute the jury to be empaneled. To do this, each side had thirteen strikes, which the parties and the courts ruling on petitioner's *Batson* claim have referred to as "peremptory challenges."

qualified venire be further reduced to thirty-eight by striking the venire person with the highest number (Juror # 81).

The court then returned to the courtroom and recessed the venire for ten minutes. Anyone who "in the past or in the present [had received] any psychological treatment" was instructed to come to chambers during the recess. The court saw four persons in chambers, all in the presence of counsel and the defendant. One had already been struck for cause, but had not been so informed, and the court found the other three individuals qualified to serve.

After this, the court, counsel and the defendant returned to the courtroom, and the entire venire, now outwardly numbering forty-eight (including the ten who had been excused for cause but were still unaware of their removal), was brought in. The venire persons were asked to stand and identify themselves, their spouses, and their places of employment. As soon as this was done, the court retired to chambers with counsel and the defendant to strike the jury.

The court and parties knew the identity of the thirty-eight venire persons who were qualified to sit and from whom the twelve-person jury would be chosen. Evans struck for the State and Abell for the defendant; each side had thirteen strikes. Evans led off, and in rapid succession— meaning that there was no time for Evans to consult Brooks or James, or for Abell to confer with Shinbaum or the defendant— the two sides, alternating, reduced the venire to the twelve-person jury. Evans excused blacks with strikes one through six, eight, eleven, and twelve. Abell used his tenth strike to eliminate a black member of the venire. The twelve venire persons remaining, one black male and eleven non-blacks, nine males and two females, constituted the jury.[5] Once everyone returned to the courtroom and the jury was sworn, the court informed the jurors that they would be sequestered and that the trial would begin at 2:30 p.m., after they returned from lunch.

Once the jurors had left the courtroom, defense counsel objected on racial grounds to Evans's striking of nine African–Americans from the venire:

> *Abell:* We need to enter an objection to the systematic exclusion of blacks before the court and we ask for a ruling on that.
>
> *Court:* Anybody want to argue that?
>
> *Evans:* We don't—we haven't put on any evidence. There is no offer of proof for systematic exclusion.
>
> *Court:* Why [sic] do you say to that?
>
> *Abell:* Well, your honor, their first three strikes were blacks, the fourth strike was a white, the next three or four were blacks. They struck two black females. And as far as a panel, we have—there aren't enough blacks in proportionate [sic] to the jury venire.[6]
>
> *Evans:* We struck those who we believed would acquit. Those strikes were not based on race but on just our exercising our right to strike jurors we feel would be most favorable to acquit. On that grounds only.
>
> *Court:* All right. Thank you for how each of you efficiently did that. I'll see everybody at 2:30.

The court declared the recess without ruling on Abell's objection. When court re-

---

5. The record does not indicate the race of these eleven non-black jurors.

6. According to the record, Evans struck the nine black jurors in the order indicated in the text *supra* rather than in the order Abell describes in this exchange.

convened at 2:30 p.m., the prosecution and defense made their opening statements and the State began its case in chief.

Three days later, on June 12, the jury found Bui guilty of capital murder and recommended a death sentence. On July 11, 1986, the court accepted the jury's recommendation and sentenced Bui to death. The Alabama Court of Criminal Appeals[7] and the Alabama Supreme Court[8] affirmed the conviction and sentence.

### B.

The United States Supreme Court vacated both appellate decisions and remanded the case for reconsideration in light of *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that a criminal defendant can bring a third party challenge to the peremptory striking of jurors based on race whether or not he is of the same race as the jurors who are struck). *See Bui v. Alabama,* 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). The Alabama Supreme Court in turn remanded the case to the court of criminal appeals, with the instruction that it remand the case to the Montgomery County Circuit Court for a hearing on the State's use of its strikes to remove black persons from the venire. *See Ex parte Bui,* 627 So.2d 848 (Ala.1991); *Bui v. State,* 627 So.2d 849 (Ala.Crim.App.1991). By this time, Evans had left the Montgom-

ery District Attorney's Office to become Alabama Attorney General and Brooks was serving as one of his assistants.

The circuit court scheduled the *Batson* hearing for September 19, 1991. Brooks appeared for the State and informed the court that Evans would not appear for the State, either as counsel or as a witness. She requested a continuance so that she could locate the prosecution's files relating to jury selection and, based on those files, explain why Evans had struck nine blacks from the venire. The court granted the continuance and reconvened the hearing on October 2. At that time, Brooks informed the court that she had been unable to locate either the notes she had made during jury selection or any notes Evans may have made. She said, however, that she had ascertained Evans's reasons for exercising the State's strikes by reviewing the trial transcript and juror occupation and criminal history lists and then "simply compil[ing] that information by juror to help the court remember and see what happened on that occasion."[9] Based on this review, she represented that Evans exercised the State's strikes on four bases: the jurors' criminal histories; the jurors' personal knowledge of the defendant, his attorneys or their family members; the jurors' employment; and, finally, the jurors' ages.

During her presentation, Brooks detailed which of these four factors, or which

---

7. *Bui v. State,* 551 So.2d 1094 (Ala.Crim.App. 1988).

8. *Ex parte Bui,* 551 So.2d 1125 (Ala.1989).

9. The transcript of the June 9, 1986 hearing on Bui's motion for an "order enjoining the prosecutor from using his peremptory challenges to systematically exclude blacks from the jury" and the transcript of the jury selection proceedings, were before the court when it held its hearings on remand on October 2, 1991 and January 23, 1992. In presenting

the State's case—that Evans struck the blacks at issue for non-racial reasons—Brooks did not testify under oath. Rather, what she told the court regarding Evans's reasons for the strikes was in the form of argument and representations—the inferences she drew from the relevant portions of the transcript of the proceedings and the criminal history and juror occupation lists. As indicated in the text *infra,* Brooks also had the notes she took during the original trial at the January 23 hearing.

combination of the four, caused Evans to exercise twelve of the State's thirteen strikes. She was unable to reconstruct any reason for the State's eleventh strike, that of Emma Rhodes, a forty-year-old black employed female with no criminal history. Regarding this prospective juror, Brooks had to admit a total lack of "any of the personal information that [the State] had about Miss Rhodes or why [the State] struck her other than she was forty years of age." Based on Brooks's representations alone, the circuit court found that "the State [had] articulated clear, cogent, and sound reasons for its peremptory strikes, all being racially neutral," and thus held that Bui had failed to establish racial discrimination sufficient to warrant granting him a new trial.

Bui appealed the circuit court's ruling to the court of criminal appeals. While the appeal was pending, Brooks uncovered the notes she had made during jury selection and asked the court to remand the case to the circuit court so that she could testify from her notes. The court granted her request, and on January 23, 1992, the circuit court heard additional representations from Brooks pertaining to the State's use of its peremptory strikes in Bui's case.[10] Although Evans was once again absent, and although Brooks once again did not claim to have actual knowledge of Evans's state of mind at jury selection, the circuit court nonetheless reiterated its finding that the State had presented race-neutral reasons for the use of its strikes, and adhered to its earlier decision denying Bui relief. Brooks remained equally unable to suggest a reason for striking Emma Rhodes. Since neither of the court's orders denying Bui relief specifically addressed the lack of any reason, race-neutral or otherwise, proffered by the State for this strike, we must infer that the court found that the State's presentation of "clear, cogent, and sound reasons" for its other twelve strikes extended, by implication, to the unexplained eleventh strike.

## II.

### A.

On appeal, the Alabama Court of Criminal Appeals determined that the record did not support the factual findings of the circuit court. The court first found error with the circuit court's consideration at the remand hearings of Brooks's representations in place of those of Evans.[11] The court found no evidence in the record to support the lower court's finding that Brooks was relating the specific reasons Evans used in striking the jurors, rather than those she would have used had she exercised the strikes. *See Bui v. State,* 627 So.2d 849, 852 (Ala.Crim.App.1992).

> Without any indication that Ms. Brooks and Mr. Evans actually agreed on any specific reason for each strike—rather than ... relying on Ms. Brooks merely being present, observing, and having the same information available to her—it is arguably impossible for us to consider Ms. Brooks's explanations to be the actual reasons Mr. Evans struck the nine blacks.

*Id.* at 853. Alternatively, the court held that even if Brooks's own reasons were acceptable for purposes of carrying the State's burden at the *Batson* hearing, the

---

**10.** At no point has the State attempted to offer information contained in Evans's own trial notes to explain the use of the challenges.

**11.** While the State did object at the remand hearing to the finding of a prima facie *Batson* case of race discrimination, it did not pursue that objection on appeal, and the court of criminal appeals upheld the finding that a prima facie case had been established.

State's total failure to present any reason for the striking of the eleventh juror prevented it from rebutting the defendant's prima facie case of race discrimination. The court of criminal appeals thus concluded that the State had engaged in racial discrimination in the use of its challenges.

On certiorari, the Alabama Supreme Court reversed the court of criminal appeals' decision, concluding that the record did support the factual findings of the circuit court. *See Bui v. State,* 627 So.2d 855, 858 (Ala.1992). Examining the reasons offered by Brooks at the remand hearings, the supreme court concluded that "the trial court *could have* reasonably inferred from [her] testimony that [she] and Mr. Evans worked as a team in striking the jury," and, thus, that Evans had exercised the State's strikes for the reasons she had articulated. *Id.* at 859 (emphasis added). The supreme court thereby found no error in the circuit court's determination that the State had discharged its burden under *Batson. Id.* The supreme court also found that the failure of the State to explain why Evans struck Emma Rhodes did not render the circuit court's finding of an absence of racial discrimination clearly erroneous. *See id.* at 859–60. Relying on dicta in an opinion from this court, the supreme court held that " '[f]ailure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case.' " *Id.* at 859 (quoting *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.

1986)). Following the supreme court's rejection of his *Batson* claim and the state courts' refusal to grant post-conviction relief on his other claims,[12] Bui filed the instant petition for federal habeas corpus relief.

### B.

■ The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) gives the United States district courts the authority to grant a writ of habeas corpus where the State adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This statute also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. *See id.* at § 2254(e)(1). This presumption of correctness applies equally to factual determinations made by state trial and appellate courts. *See Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).[13]

The AEDPA governs Bui's petition for federal habeas corpus relief. Bui raised nineteen claims in his petition, including the *Batson* challenges described above.[14]

---

**12.** As indicated *supra* note 2, Bui attacked his murder conviction on a total of twenty-eight grounds. Only two are before us in this appeal.

**13.** Although the Court in *Sumner* was interpreting section 2254 as it existed pre-AEDPA, the holding hinged on the fact that no distinction was made between state trial and appellate courts in the pre-AEDPA version of sec-

tion 2254—a fact which continues to be true of the current version of the statute.

**14.** Only two issues were presented by Bui before this court—the State's elimination of blacks from the venire and the trial court's refusal to allow Bui to question prospective jurors on racial bias. *See supra* note 2.

The district court upheld the Alabama Supreme Court's holdings on both of the *Batson* issues. First, the court held that "the mere absence of Evans at the posttrial *Batson* hearing d[id] not prevent the State from satisfying" its *Batson* burden of providing race-neutral reasons for its strikes. The court acknowledged that it was Evans's own intent which was the key to the *Batson* inquiry, but found that sufficient evidence of this intent could be found in Brooks's testimony, *if* she knew his reasons. The court went on to conclude that it was not clear factual error for the trial court to find, and the supreme court to affirm, that Brooks did know Evans's reasons, based on her testimony at the remand hearing that she "did participate with [him] in [striking the jury]. [She] was present, [she] observed him strike, and [they] had the same information available to [them] at that time." This factual finding, the district court held, was entitled to the presumption of correctness mandated by section 2254(e)(1).

Next, the district court addressed the supreme court's interpretation of federal law on the question of whether the State's failure to explain its eleventh strike constituted a *Batson* violation. The court noted the absence of United States Supreme Court precedent in this area and agreed with the Alabama Supreme Court's application of this court's dicta in *United States v. David,* 803 F.2d 1567 (11th Cir.1986), holding that the decision established the principle that "a single juror is not necessarily discriminated against merely because a reason for striking that juror has not been articulated, if there are sufficient other factors from which to draw the conclusion that there was no intentional discrimination against that juror." From this basis, the court determined that the supreme court had not based its decision on an unreasonable interpretation or application of federal law.

Finally, the district court addressed the circuit court's fact finding on the ultimate *Batson* issue—that no racial discrimination was committed by the State during jury selection for Bui's trial. The court relied on four factors in concluding that the circuit court's decision that no discrimination existed was not clearly erroneous: that the reasons offered by the State were not disparately applied; that the reasons were supported by the record; that one black served on the jury; and that the circuit judge had expressed sensitivity to *Batson* problems. Thus, the district court accorded this determination the deference provided for in the federal habeas statute, 28 U.S.C. § 2254.

### III.

In *Batson v. Kentucky,* the United States Supreme Court held that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection." 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986). Courts must engage in a three-step analysis in evaluating *Batson* claims. First, the defendant must establish a prima facie case of discriminatory intent on the part of the prosecution. A prima facie case is constructed by a showing by a defendant that " 'he is a member of a cognizable racial group' and that the 'relevant circumstances raise an inference' that [the prosecution] has 'exercised peremptory challenges to remove from the venire members of [his] race.' " *Fludd v. Dykes,* 863 F.2d 822, 829 (11th Cir.1989) (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723). The requirement that a criminal defendant raising a *Batson* challenge must show commonality of race with excluded jurors was eliminated by the Supreme Court in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Once a court has

determined that a prima facie case of discrimination against black jurors has been established, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. If the State clears this hurdle, the trial court then has the responsibility to determine whether the defendant has established purposeful discrimination. *See Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995) (per curiam).

In this appeal, Bui argues that the trial court erred when it concluded that he had failed to establish a *Batson* violation. Since this case is governed by section 2254 of AEDPA, we may not grant Bui's petition for a writ of habeas corpus unless Alabama's adjudication of his claim resulted in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2). We also must presume the state court's findings of fact correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). With these principles in mind, we consider whether the Montgomery County Circuit Court erred in concluding that the State had "come forward with a neutral explanation for challenging [the] black jurors," *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, despite its failure to present any race-neutral reasons of the prosecutor who actually exercised the strikes, and despite its failure to present any reason at all for striking Emma Rhodes from the venire.

### A.

■ As the district court acknowledged, "[i]t is axiomatic that one cannot know another's state of mind." Nonetheless, Brooks claimed to have known Evans's state of mind—why he struck nine blacks from the venire—when she told the trial judge that Evans exercised his strikes for race-neutral reasons.

Brooks's task of adducing evidence of Evans's race-neutral state of mind was all the more formidable because, as the trial transcript indicates, Evans thought that he could strike blacks from the panel solely on account of their race: *Batson* did not apply, he thought, because Bui was not black; he was "oriental." Moments before jury selection began—in opposing Bui's motion for an "order enjoining the prosecutor from using his peremptory challenges to systematically exclude blacks from the jury"—Brooks cited *Batson,* thereby suggesting that *Batson* foreclosed Bui's motion, and Evans said: "Let me put it on the record that the defendant is of oriental distraction; he is not black." In other words, Brooks and Evans were telling the court that Evans could strike blacks from the venire for any reason, including a racial reason, and, further, that he could not be made to disclose the reason on the record. Since this was Evans's state of mind moments before he made his strikes, Brooks had to convince the court—five years later—not only that she knew Evans's state of mind, but also that he had in fact changed that state of mind before he made the strikes. It was no wonder, then, that the trial judge voiced concern over Evans's failure to attend the hearing: "another problem I have, and I know Evans is busy and Brooks is presenting this matter, but *Evans actually struck the jury* .... Evans is not here and I can't listen to his comments and reasons .... [t]hat's another little problem I have." (emphasis added). Brooks understood the court's task, remarking that the court "must evaluate now *Evans'* state of mind."

After hearing from Brooks, the court concluded that she had met the State's burden of offering non-racial reasons for the strikes at issue, a conclusion that it could only have reached if it found that her statements had probative value—that they represented the reasons Evans had in mind when he made the strikes.

This conclusion, however, is wholly unsupported by the record. Brooks did state that "[she] did participate with [Evans] in [striking the jury]. [She] was present, [she] observed him strike, and [they] had the same information available to [them] at that time." The Alabama Supreme Court placed great weight on this statement and on Brooks's use of the word "we" in describing the process of striking the jury, finding that "the trial court *could have* reasonably inferred ... that Ms. Brooks and Evans worked as a team in striking the jury, and, thus, that the reasons given by Ms. Brooks for striking the black persons from the venire were the reasons" used by Evans at trial. *Bui v. State*, 627 So.2d at 859 (emphasis added). While the district court also found no clear error in "a finding [by the trial judge] that Brooks was in a position to articulate the reasons for the state's peremptory strikes," the trial judge himself never explicitly drew such an inference.

Indeed, the trial court could not reasonably have found that Brooks was in a position to know the inner workings of Evans's mind at trial—specifically, that race did not play a significant role in his

decisionmaking. Even though Brooks had three opportunities to do so, she never claimed to have actually discussed with Evans his reasons for each of the strikes he exercised. In fact, she never claimed to have discussed the issue with him at all, beyond requesting his trial notes, which she was never able to locate.[15]

Even if we were to assume for a moment that Brooks and Evans discussed the venire persons who should be struck—because they might be inclined to acquit Bui or oppose a death-penalty recommendation—the method the court used to select the jury makes it highly unlikely that Brooks would have known what was in Evans's mind—in terms of non-racial reasons—when he exercised the challenged strikes for the State. The transcript of jury selection reveals that the prosecutor and defense counsel alternated strikes quickly, without being afforded an opportunity to consult with anyone between strikes. Thus, Evans would have had to adjust any pre-existing strategy on the spot, depending on the strikes defense counsel made.

With nothing in the record—save Brooks's representations and argument—from which to find that Brooks was in fact presenting Evans's reasons (for excusing eight black jurors), we find the trial judge's contrary finding an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d)(2).[16] Without finding this subsidiary fact, the circuit court would have been unable to find that the State had

---

**15.** If Brooks had testified as to statements Evans made to her before or during selection of the jury involving his intent with regard to exercising the State's strikes, those statements could have been considered by the court as evidence of Evans's state of mind under the state of mind exception to the hearsay rule. *See* Fed.R.Evid. 803(3). Any later statements made by Evans as to why he exercised the State's challenges, beyond this narrow time

frame, however, would constitute rank hearsay.

**16.** As our discussion in part I.B, *supra*, indicates, Brooks could not even speculate as to why Evans struck Emma Rhodes; yet, the trial judge implicitly found that the reasons Brooks offered for Evans's other strikes served as the reason for striking Rhodes.

carried its burden, and would have granted Bui relief for the violation of his equal protection rights.

The State urges this court to uphold as reasonable the finding that Brooks presented Evans's reasons for striking eight of the blacks from the venire because Brooks was familiar with the case, could articulate reasons for all but the Rhodes strike, and had presented much of the State's case at Bui's trial.[17] While these facts are all clear from the record, they are simply insufficient to carry the State's obligation under the Batson analysis.[18] Brooks's familiarity with Bui's case and her role at trial have no bearing on her knowledge of Evans's reasons for striking venire members during jury selection. That she was able to articulate reasons for the strikes could just as plausibly have resulted from the fact that she "[l]ook[ed] over the transcript and the information still available in the district attorney's office," as from actual knowledge of those reasons. Bui v. State, 627 So.2d at 858.

■ In that we are unable to rely on Brooks's representation that Evans exercised the State's strikes for non-racial reasons, we are left with only Evans's good faith assertions at trial that he struck no one due to race; rather, that he stuck

those who would be "favorable to acquit." With nothing but these good faith assertions, we must conclude that the State failed to satisfy its Batson burden of coming forward with a race-neutral explanation. The Supreme Court has instructed that a prosecutor may not "rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections." Batson, 476 U.S. at 98, 106 S.Ct. at 1723–24 (internal quotations and citation omitted). Furthermore, this court has held that vague explanations will be insufficient to refute a prima facie case of racial discrimination. See United States v. Horsley, 864 F.2d 1543, 1546 (11th Cir.1989) (per curiam). Just as the prosecutor's explanation in Horsley that "I just got a feeling about [one juror] as I have about ... several others" was deemed insufficient for vagueness, so, too, must Evans's attempt to justify all nine of the State's strikes against black venire persons by claiming that he felt they "would be most favorable to acquit" Bui. To the extent that the trial judge's determination was based on Evans's statement of good faith, rather than Brooks's representations, it was contrary to clearly established Federal law. See 28 U.S.C. § 2254(d)(1).

---

**17.** At trial, Brooks made the opening statement and examined many of the State's witnesses.

**18.** The fact that not a shred of evidence of Evans's intent in exercising the State's strikes was introduced, beyond Brooks's mere conjecture, sets this case apart from hypothetical cases in which a petitioner simply defers his Batson challenge until memories have faded or the prosecutor is no longer available. Of course, by deferring his challenge, the petitioner runs the risk of a procedural default. In many, if not most, of the cases in which no default has occurred, some evidence of the prosecutor's state of mind will be left behind—either in the form of statements made

by the prosecutor at the time of jury selection and later admissible under the state of mind exception to the hearsay rule, see supra note 15, or in the form of contemporaneous notes later used to refresh the prosecutor's exhausted recollection.

We note in passing that this case arose prior to the issuance of the Supreme Court's decision in Powers. Had Powers been the controlling law at the time of Bui's trial, the judge would have responded to Bui's prima facie showing of a Batson violation by requiring Evans to explain the reasons for his strikes. Had this been done, the Alabama courts would not have needed to divine Evans's thoughts after the fact.

### B.

We now consider whether *Batson,* or its progeny, excuses the State's failure to present any reason for striking Emma Rhodes.

Latching on to dicta in *David,* the Alabama Supreme Court held that " '[f]ailure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case.' " *Bui v. State,* 627 So.2d at 859 (quoting *David,* 803 F.2d at 1571). The supreme court also relied on dicta in a Fifth Circuit case, *United States v. Forbes,* 816 F.2d 1006, 1011 n. 7 (5th Cir.1987), for the proposition that the existence of extrinsic factors may allow the court to find an absence of racial discrimination where the prosecution has failed to provide the court with a race-neutral reason. *See Bui v. State,* 627 So.2d at 859–60. In the instant case, the supreme court found these factors to include: (1) that Bui was Vietnamese and tried before the decision in *Powers;* (2) that the prosecutors were forced to come forward with race-neutral explanations five years after trial; (3) that race-neutral reasons were given for eight of the nine strikes against black jurors; (4) that neither a black defendant nor a black victim was involved; (5) that one black served on the jury; (6) that the defense itself struck one black venire person; and (7) that the circuit judge himself was black. *See id.* at 860. Based on these factual findings, the supreme court found no clear error in the circuit court's ultimate finding of an absence of racial discrimination. *See id.* The district court found first that the supreme court's application of federal law to the instant facts was reasonable under 28 U.S.C. section 2254(d)(1), and second that the state courts did not clearly err in their ultimate fact finding of no discrimination.

■ The district court correctly upheld the supreme court's application of federal law as reasonable. It is of course permissible for a trial judge to turn to circumstantial evidence to support an inference that a race-neutral reason underlies a particular strike, despite the lack of any explicit race-neutral explanation from the State. Thus, mere failure to explain every strike of black jurors will not necessarily prevent a prosecutor from successfully rebutting a prima facie case of race discrimination, where there is sufficient circumstantial evidence from which the court can deduce a race-neutral reason. The error of the district court does not lie in its affirming the Alabama Supreme Court's reliance on this legal principle, but in upholding an unreasonable determination of the facts in light of the evidence contained in the record.

■ It was clearly erroneous for the supreme court to conclude that the record contained evidence sufficient to permit the trial judge, or the supreme court itself, to conclude that the State had come forward with a race-neutral motivation for its eleventh strike. Of the seven factors relied on by the supreme court in reaching this conclusion, four are wholly irrelevant: that a Vietnamese defendant was tried before the decision in *Powers;* that there was a five-year delay between the strikes themselves and the remand hearings, where an explanation was necessitated; that the defense struck one black person from the venire; [19] and that a black judge was not convinced that the state's strikes were racially moti-

---

**19.** As *Batson* instructs us to be equally protective of the equal protection rights of the potential jurors as we are of those of the defendant, the fact that Bui himself may have unclean hands can have no bearing on our determination of whether the State's use of its strikes to remove blacks from the jury passes constitutional muster.

vated. The factor that would otherwise be the strongest circumstantial evidence, that race-neutral reasons were presented for the other eight strikes of black jurors, is an unreasonable determination of the facts in the record, as discussed in subpart A. That one black served on the jury, while a significant fact that may be considered as circumstantial evidence, does not itself bar a finding of racial discrimination. *See Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir.1995). Similarly, the fact that neither Bui nor the victims were black, while noteworthy, is not alone sufficient to support a court's finding of an absence of race discrimination. We consequently conclude that these latter two factors, standing alone, were insufficient circumstantial proof from which a court could find that the State had a race-neutral reason for striking Emma Rhodes.

## IV.

Bui was denied equal protection of the law by the State's failure to rebut his prima facie case of race discrimination in jury selection, in violation of the principles established in *Batson v. Kentucky* and its progeny, and is therefore entitled to habeas corpus relief. We therefore REVERSE the district court's decision to the contrary and REMAND the case with instructions to issue a writ of habeas corpus conditioned on the State's right to provide Bui a new trial within a reasonable period of time.

SO ORDERED.

BLACK, Circuit Judge, dissenting:

I respectfully disagree with the majority on three points. First, I think the prosecution more than carried its limited burden of production at *Batson*'s step two, a conclusion the majority sidesteps in part by heightening the prosecution's burden and conflating the step two and step three analyses. Second, I think the majority fails to respect the presumption of correctness that AEDPA mandates for *Batson* determinations, a presumption that can be rebutted only by petitioner Bui with clear and convincing evidence (which he lacks in this case). Finally, I think the majority announces a new rule of law that is not only unjustifiable but also inconsistent with our precedents.

## I.

To reach its result, the majority confronts the following obstacle: *Batson* determinations are factual, and factual determinations are presumed correct under 28 U.S.C. § 2254(e)(1). To avoid this obstacle, the majority must point to clear and convincing evidence that shows the state court's *Batson* conclusions to be "unreasonable determination[s] of the facts." 28 U.S.C. § 2254(d)(2). Rather than pointing to such clear and convincing evidence, the majority circumvents the presumption of correctness by concluding the prosecution failed to meet its burden at *Batson*'s step two. *See* Opinion at 1315–16 ("[T]he circuit court would have been unable to find that the State had carried its burden [at step two], and would have granted Bui relief for the violation of his equal protection rights.").

This is an anomalous conclusion because the prosecution's burden at step two is so light. The Supreme Court has emphasized that the prosecution need only articulate or proffer[1] a rationale for its strikes that

---

1. The canonical version of step two appears to speak of the prosecution's "articulating" a race-neutral reason for its strikes. *See, e.g., United States v. Brown*, 299 F.3d 1252, 1255 (11th Cir.2002); *United States v. Allen–Brown*, 243 F.3d 1293, 1297 (11th Cir.2001); *United States v. Tokars*, 95 F.3d 1520, 1533 (11th Cir.1996); *Hollingsworth v. Burton*, 30 F.3d

is facially race-neutral. *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) ("At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.") (citation omitted); *United States v. Brown*, 299 F.3d 1252, 1255 (11th Cir. 2002) ("If the explanations of the strike offered in response are devoid of inherent discriminatory intent, even if not persuasive, the court then proceeds to the ultimate inquiry of whether the objecting party has shown purposeful discrimination."). The Court has said that even if the prosecution's explanation is implausible, it carries the burden of production. *Purkett*, 514 U.S. at 767–68, 115 S.Ct. at 1771; *United States v. Novaton*, 271 F.3d 968, 1002 (11th Cir.2001); *United States v. Tokars*, 95 F.3d 1520, 1533 (11th Cir.1996). In other words, *Batson*'s step two screens out very few reasons proffered by the prosecution as a legitimate nondiscriminatory reason for its strikes.

Of course, certain proffered reasons are clearly barred. A prosecutorial hunch is not sufficient for *Batson*'s step two. *See Batson*, 476 U.S. at 97, 106 S.Ct. at 1723 ("But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race."). Nor can the prosecution simply plead its good faith or lack of a discriminatory motive. *Id.* at 98, 106 S.Ct. at 1723–24. On the other hand, the prosecution's step two explanation "need not rise to the level of justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723. "What [*Batson*] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769, 115 S.Ct. at 1771.

The evidentiary requirements of *Batson*'s step two are illuminated by the analogous requirements of the similar, three-step burden-shifting regime of *McDonnell Douglas* and its progeny. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[2] Thus, at step two, a defendant employer must articulate a legitimate nondiscriminatory reason that is "clear and reasonably specific." *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. The defendant employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254, 101 S.Ct. at 1094. The Supreme Court later clarified what evidence is sufficient to car-

---

109, 112 (11th Cir.1994). *Batson* itself speaks only of "coming forward" with a neutral explanation. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *see also Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995). We have also sometimes stated that the prosecution must simply "proffer" an explanation. *United States v. Novaton*, 271 F.3d 968, 1002 (11th Cir.2001) ("the prosecution must proffer a race-neutral explanation for its strikes"); *see also Purkett*, 514 U.S. at 769, 115 S.Ct. at 1771 (referring to the "proffered explanation"). Finally, the Su-

preme Court has spoken of "tendering" a race-neutral reason. *Purkett*, 514 U.S. at 767, 115 S.Ct. at 1770–71 (describing the next step "if a race-neutral reason is tendered").

**2.** The Supreme Court made the same comparison to *McDonnell Douglas* in *Batson*. *See Batson*, 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18. The three-step analysis in both contexts ultimately derives from the same source, the Constitution's guarantee of Equal Protection.

ry the burden at step two: "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Hicks*, 509 U.S. at 509, 113 S.Ct. at 2748. As in the *Batson* context, very little is required to carry the burden of production at step two; indeed, we have described this burden as "exceedingly light." *Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir.1995).

Once the prosecution has met its burden of production under *Batson*'s step two, the district court must then evaluate the evidence and determine whether the objector has met his burden of proving a discriminatory motive. *Purkett*, 514 U.S. at 767, 115 S.Ct. at 1770–71 ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination."); *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 ("The trial court then will have the duty to determine if the defendant has established purposeful discrimination."). Evaluation of the evidence is appropriate only after the government has sufficiently articulated its nondiscriminatory reason for exercising its strikes. As the Supreme Court has explained in the employment discrimination context, "the determination that a defendant has met its burden of production ... can involve no credibility assessment. For the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *Hicks*, 509 U.S. at 509, 113 S.Ct. at 2748.

In short, to satisfy *Batson*'s step two, the State has only to proffer or articulate reasons that are *facially* race-neutral. It is Bui—at *Batson*'s step three—who bears the ultimate burden of proving the reasons proffered by the State are pretextual and the real reason for the prosecution's strikes is purposeful discrimination.

Whatever teeth *Batson*'s step two has are derived from the immediacy with which the prosecution must ordinarily carry its burden of producing a race-neutral reason for exercising its strikes; in the usual case, the objector will state her *Batson* objection and prima facie case, and the prosecution will then be required to proffer at once its race-neutral explanation. The only way for the prosecution to fail at step two is for it to falter in articulating its race-neutral reason, either by adverting to a mere hunch or else stating a reason that is discriminatory on its face. *See Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24. Indeed, the ease with which the prosecution could articulate a race-neutral reason has led to the common criticism that the three-step *Batson* analysis proves an illusory defense to discrimination in jury selection. *See id.* at 106, 106 S.Ct. at 1728 (Marshall, J., concurring) ("Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill-equipped to second-guess those reasons."). That criticism is premised on the correct understanding of the law of *Batson*, which places on the prosecution only a very light burden of production at step two.[3]

Given the ease with which the prosecution can survive *Batson*'s step two, it is remarkable that the majority decides this case at step two. *See* Opinion at 1430. The transcripts of the 1991 and 1992 *Bat-*

---

3. To return to the analogous employment discrimination context, it is unlikely that an employer will fail at *McDonnell Douglas'* step two. Indeed, Judge Denny Chin has observed in a recent article "there is not a single reported case in which a plaintiff prevails at the second step in a discrimination lawsuit be-

cause a defendant employer is unwilling or unable to articulate a legitimate, nondiscriminatory reason for its employment action." Denny Chin & Jodi Golinsky, *Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases*, 64 BROOK. L.REV. 659, 665 (1998).

*son* hearings does not indicate that the prosecution asserted a facially discriminatory reason or mere hunch, nor did it rebut Bui's prima facie case with assertions of its own good faith. Thus, nothing suggests that the prosecution's effort to come forward with a facially race-neutral reason for its strikes suffered from the normal defects that attend *Batson*'s step two.

The question the majority should therefore ask is whether Brooks' presentations permitted a fact-finder to conclude the prosecution had articulated a race-neutral reason for striking the jury. *See Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (describing the burden of production at *McDonnell Douglas*'s step two as introducing evidence that permits a finding of a nondiscriminatory reason). Recall that Brooks did not need evidence rising to the level justifying a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. Indeed, Brooks' stated reason did not even have to make sense. *Purkett,* 514 U.S. at 769, 115 S.Ct. at 1771 ("What it means to be a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection."). All that matters is that Brooks—the second-chair prosecutor, who participated extensively in the trial—articulated facially race-neutral reasons, which taken as true, would permit the conclusion that there were nondiscriminatory reasons for the prosecution's strikes. *Id.* at 768, 115 S.Ct. at 1771 ("the issue is the facial validity of the prosecutor's explanation"); *Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (requiring that the reasons stated at step two be "taken as true" and that credibility assessments be deferred until step three).

This is exactly what the trial court concluded and the Alabama Supreme Court ultimately affirmed: "the trial court could have reasonably inferred ... that Ms.

Brooks and Evans worked as a team in striking the jury, and, thus, that the reasons given by Ms. Brooks for striking the black persons from the venire were the reasons [for the strikes]." *Bui v. State,* 627 So.2d 855, 859 (Ala.1992). The majority emphasizes that the trial court only "could have" so inferred, not that it was required to do so based on Brooks' presentation. Yet this hypothetical inference, if taken as true, is more than sufficient to carry the prosecution's burden at step two. *See Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (requiring the reason articulated at step two be taken as true). After all, the step two burden can be carried with even a "silly and superstitious" reason. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771.

In other words, the majority—despite its claims to the contrary—is not deciding this case at *Batson*'s step two, where it might be possible to overcome AEDPA's presumption of correctness by finding that the prosecution's rebuttal was "wholly unsupported by the record." *See* Opinion at 1315. What the majority does is slide its review into step three. This move is manifest when the majority claims "Brooks had to *convince* the court—five years later—not only that she knew Evans's state of mind, but also that he had in fact changed that state of mind before he made the strikes." *Id.* (emphasis added). This misstates the prosecution's burden at *Batson*'s step two. The prosecution must simply produce a facially nondiscriminatory reason for its strikes. It need not "convince" the court of anything. *See Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771 (stating that it was error to "requir[e] that the justification tendered at the second step be not just neutral but also at least minimally persuasive"); *Brown,* 299 F.3d at 1255 ("If the explanations of the strikes offered in response are devoid of inherent discriminatory intent, *even if not persuasive,* the court then proceeds to the ulti-

mate inquiry of whether the objecting party has shown purposeful discrimination.") (emphasis added); *see also Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (limiting evaluation of a proffered race-neutral reason to step three, not step two).

By drifting into *Batson*'s step three, the majority makes another error in its analysis. At step three, Bui—not the State—bears the burden of proof. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771 ("It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether *the opponent* has carried his burden of proving purposeful discrimination.") (second emphasis added); *Novaton,* 271 F.3d at 1002–03. The panel majority never claims that Bui produces *any* evidence that could carry this burden; after all, the majority denies that it has reached the step three inquiry, despite making judgments about persuasiveness that are not appropriate at step two.

An accurate *Batson* step two inquiry can only conclude with the factual finding that the prosecution carried its minimal burden of producing a facially race-neutral reason for its strikes. That reason can be evaluated only at step three of *Batson,* at which point Bui would bear the burden of proving that the prosecution's proffered reasons were pretextual. Bui cannot carry this ultimate burden of persuasion, so his *Batson* challenge must fail.

## II.

In examining the State court's *Batson* analysis, the majority should be constrained by the presumptions and burdens established for habeas review in AEDPA. "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).[4] A habeas petitioner can rebut this presumption of correctness only with clear and convincing evidence. *Id.* Moreover, the writ cannot be granted unless the State court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State proceeding." *Id.* § 2254(d)(2). Although the prosecution bears the minimal burden of production at step two of the original *Batson* hearing, on federal habeas review, Bui now bears the burden of proving, by clear and convincing evidence, that the state courts' factual findings were unreasonable. This he cannot do.

I must concur with the philosophical truth that a person cannot know the mind of another. Courts nevertheless regularly draw inferences about states of mind based upon the evidence before them. The evidence Brooks presented at the two *Batson* hearings supports just such an inference. As a member of the prosecution team, Brooks was Evans' second-chair, and she participated directly at trial.[5] As she

---

4. AEDPA deference is required as to every stage of the *Batson* analysis because *Batson* conclusions constitute fact-finding. *Allen–Brown,* 243 F.3d at 1297 ("[a] district court's finding as to why a juror is excused is an issue of fact"); *Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1321 (11th Cir.1999) ("A district court's *Batson* determinations are largely findings of fact entitled to great deference on review."); *Hollingsworth,* 30 F.3d at 112 ("[T]he trial court's finding of no discrimination is a fact finding."). Even without AEDPA's deferential standard of review, *Bat-*

*son* instructs that the trial court's finding of no discrimination is entitled to great deference. *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *Hollingsworth,* 30 F.3d at 112.

5. It is obviously quite common for the prosecution to be represented by a team of trial lawyers. It is also common for a trial court to allow only one lawyer at a time to speak for the prosecution. At the two *Batson* hearings in this case, Brooks was the lawyer who spoke for the prosecution.

explained at the first *Batson* hearing, "Mr. Evans was lead counsel and he actually struck the jury. He is unable to be here. I did participate with him in that [i.e., striking the jury]. I was present, I observed him strike, and we had the same information available to us at that time. He was lead counsel, however. We struck primarily on the following bases." Brooks then went on to articulate the four reasons the prosecution struck certain jurors, including how these reasons applied to specific jurors. For example, in light of Bui's murdering his children in an allegedly insane rage, Brooks explained that the prosecution team sought a jury of mature, responsible individuals who knew how to handle the pressures of responsibility at work or at home:

> We were looking for people who had some maturity, some experience in life, who were old enough perhaps to have children since this involved the death of three children, who perhaps had had marital problems since this apparently was triggered or involved the defense of a relationship between the defendant and his wife, and the defense we anticipated would bring out, and did bring out, some difficulties between the two of them. We were looking for people who

had made decisions in life such as, you know, to get married, to take a job, to make job decisions, to make decisions on how to raise their kids. People who had some maturity. Therefore, we made a list of the youngest people, and we attempted to strike based on the youngest.

By the end, Brooks was able to explain how the prosecution team's strategy led to twelve of its thirteen strikes.[6]

In addition, Brooks introduced juror data cards or rosters identical to those used by the prosecution at voir dire; these documents contained the name, address, race, gender, age, occupation, and criminal history of each prospective juror. Some of the documents also included handwritten notations related to the reasons for the prosecution's strikes. At the second *Batson* hearing, Brooks augmented her previous explanation with her contemporaneous trial notes, which included her hand-written impressions of struck jurors.[7] All of this constitutes circumstantial evidence such that, if it is believed, the State courts could easily conclude, as they did in this case, that Brooks was stating race-neutral reasons for the prosecution's strikes. *Cf. Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (describing the step two burden of production as requiring "evidence which, *taken as*

---

**6.** For example, Brooks recounted specific reasons why certain minority jurors were struck:

> The state's first strike was number 66. 66 was a black female. She was 24 years of age. According to our records, we got a match from records or from the D.A.'s office at the time that did this work and provided us with a criminal history of this juror of buying and receiving stolen property, two cases; grand larceny and receiving and concealing stolen property, two cases; theft of property in the second degree, two cases; burglary third and theft of property in the second and a theft of property in the first degree. At the time we struck the jury, we believed that this juror had an extensive criminal history. In addition, she was only 24 years of age....

> Our second strike was juror number 80. Number 80 was 20 years old, a black female who had a harassment arrest just a year or so before this case. We struck based on the criminal history and the young age of that juror....
>
> ....
>
> The state's next strike was number 62. 62 was 24 years old unemployed black male who had a trespassing arrest within a year or so of this case—prior to this case. We struck because of the age, the lack of job, and the criminal history.

**7.** Despite her searches, Brooks was unable to locate any similar trial notes from Evans.

*true,* would *permit* the conclusion that there was a nondiscriminatory reason").

On the basis of Brooks' presentation, the State courts readily concluded that the prosecution had carried its minimal burden of articulating a facially race-neutral reason for exercising its strikes. Hence, after the first *Batson* hearing, the trial court explicitly found "the state has articulated clear, cogent, and sound reasons for its peremptory strikes, all being racially neutral." *Bui,* 627 So.2d at 858. The Supreme Court of Alabama subsequently accepted the trial court's conclusion that "the reasons given by Ms. Brooks for exercising the state's peremptory strikes were the reasons underlying the state's use of its peremptory strikes at the trial." *Id.* at 859.

In order to prevail on habeas review, it is up to Bui to show with clear and convincing evidence that these conclusions amounted to an unreasonable determination of the facts. The majority, however, lifts this burden from Bui and instead demands the prosecution prove that which its circumstantial evidence showed: that Brooks was able to report Evans' state of mind. What the majority does is to drive an epistemological wedge between Brooks and Evans, and then demand that the prosecution overcome it.

The gist of the majority's argument is that Brooks did not present sufficient evidence at the two *Batson* hearings to establish that she could speak to what was in Evans' mind. The majority repeatedly notes that Brooks never affirmatively claimed to have knowledge of Evans' state of mind. *See* Opinion at 1311 ("Brooks

once again did not claim to have actual knowledge of Evans's state of mind at jury selection"); *id.* at 1315 ("Even though Brooks had three opportunities to do so, she never claimed to have actually discussed with Evans his reasons for each of the strikes he exercised."). Because Brooks never specifically contradicted the majority's assumption that there was a wedge between her and Evans, the majority rejects the prosecution's step two rebuttal.

This gets the burdens of proof exactly backwards. The State courts accepted Brooks' presentation as sufficient to carry the prosecution's step two burden of production; thus, Bui now bears the burden of proving, by clear and convincing evidence no less, that the State court got it wrong. 28 U.S.C. § 2254(e)(1).[8] On habeas review, the majority cannot posit its own wedge between Brooks and Evans and then demand that the prosecution rebut it. On habeas review, it is up to Bui to prove that there really is some gap between Evans' actual state of mind and Brooks' presentation of the prosecution's race-neutral reasons for its strikes. Brooks' failure to assert that she knew what Evans was thinking cannot alter the presumption of correctness that attaches to the State court's findings. The burden now rests entirely with Bui, and he has failed to carry his burden.

The majority cannot look behind Brooks' statements and ask whether there is any evidence that affirmatively fills in the inference that Brooks—by virtue of her role in the prosecution—knew Evans' state of mind when he made the strikes. This

---

8. Of course, Bui carries the ultimate burden of proof in his *Batson* challenge. *Purkett,* 514 U.S. at 767, 115 S.Ct. at 1770 ("If a race-neutral reason explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination."); *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724 ("The trial court then will have the duty to determine if the defendant has established purposeful discrimination.").

stands federal habeas review under AEDPA on its head. The record does not permit the conclusion that Bui can carry his burden of proving by clear and convincing evidence that the State court's factual determinations were wrong.[9]

## III.

In blending *Batson*'s steps two and three and circumventing the AEDPA presumptions and burdens, the majority effectively announces a new rule: the prosecutor who actually strikes the jury must testify as to her own state of mind, or else the prosecution will have great difficulty carrying its burden of producing a race-neutral reason at *Batson*'s step two.[10] This rule is wrong because it is premised on a view of *Batson*'s step two that significantly increases the minimal burden of production that the prosecution bears. *See supra* Part I. This rule is also mistaken because it appears to have been already rejected by this Circuit.

In *Hollingsworth*, the defendant raised a *Batson* challenge to the prosecution's use of nine of its fourteen peremptory challenges to strike African–American poten-

tial jurors. *Hollingsworth*, 30 F.3d at 110. While it is unclear from the opinion what member of the prosecution's team actually carried out the strikes,[11] the defendant apparently based part of his *Batson* challenge on the lead prosecutor's failure to testify at the *Batson* hearing. *Id.* at 113 n. 5. It seems logical to conclude the defendant raised this challenge because the lead prosecutor made the strikes,[12] as Evans did in this case. Nonetheless, the Court in *Hollingsworth* summarily rejected the *Batson* challenge predicated on the lead prosecutor's failure to testify at the hearing. *See id.* (finding that argument "without merit and warrant[ing] no discussion"). That conclusion follows in part from the minimal burden placed on the prosecution at *Batson*'s step two; if the prosecution need only articulate facially race-neutral reasons for its strikes, evidence from the lead prosecutor (who presumably carried out the strikes) would not have been required in order to carry the burden.

At the very least, the majority's rule requiring the lead prosecutor to appear at a *Batson* hearing is inconsistent with the tenor of our opinion in *Hollingsworth*. More than that, it is inconsistent with the

9. I note also that, regarding the prosecution's final strike (for which it could articulate no race-neutral reason) the majority acknowledges the prosecution's race-neutral reasons for striking the other jurors presents strong circumstantial evidence of its race-neutral reasons for striking this last juror. Because I think the prosecution carried its burden of production at *Batson*'s step two, I would conclude that the prosecution's proffer of race-neutral reasons for its other strikes was more than sufficient to support the state courts' finding that there was no *Batson* violation with respect to this challenge.

10. To be sure, this is a rule of (hopefully) limited application. In the usual case, the prosecutor who strikes the jury will immediately be called upon to explain her state of mind in doing so.

11. The opinion refers to "the prosecution" or "the State." *See Hollingsworth*, 30 F.3d at 110–13. In only one place does the opinion refer to "[t]he prosecutor," though without identifying a specific lawyer.

12. Indeed, it is hard to understand why else the defendant in *Hollingsworth* would have argued that the absence of the lead prosecutor at the *Batson* hearing would have been reversible error. If the lead prosecutor was not the lawyer who carried out the strikes, then her testimony would have contributed little beyond whatever other factual information was already available from the other prosecuting attorneys. Hence, I can understand the defendant's challenge in *Hollingsworth*—which was summarily rejected by this Court—only if it were substantially the same as the argument the majority accepts here.

law governing the minimal burden of production at *Batson*'s step two.

## IV.

In conclusion, the majority makes three errors: (1) it misapplies the burden of production at the second step of the *Batson* analysis; (2) it lifts the burden of proof from habeas petitioners to rebut the presumption of correctness afforded to state courts' factual determinations; and (3) it announces an unjustified new rule of law that has most likely already been rejected by this Circuit in *Hollingsworth*.

In voicing my disagreements with the majority, I take the unusual step of dissenting from a panel opinion I had originally joined. *See Bui v. Haley,* 279 F.3d 1327 (11th Cir.2002), *withdrawn* —— F.3d —— (11th Cir.2003). If nothing else, my doing so confirms that the task of judging is to seek, as best a fallible human being can, the correct result in every case. The quest for the right answer to the issue before us always carries with it the real possibility of an incorrect answer; indeed, the existence of such incorrect answers is the best evidence the judicial quest is for right answers. An honest judge, therefore, might sometimes be called upon to report her own error. I do so in this case because my further reflection convinces me that the answer reached by the majority—the answer I had once accepted—is in fact incorrect. I therefore respectfully dissent.