[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13 2007
THOMAS K. KAHN
CLERK

_____

No. 05-12330

_____

D.C. Docket No. 01-00558-CV-SLB

JIMMY DILL,

Petitioner-Appellant,

versus

RICHARD F. ALLEN, Commissioner
Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(June 13, 2007)**

Before EDMONDSON, Chief Judge and TJOFLAT and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner, Jimmy Dill,[1] is an Alabama prisoner on death row due to his conviction for the 1988 fatal shooting of Leon Shaw in Birmingham. On March 30, 2001, he petitioned the United States District Court for the Northern District of Alabama for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court denied his petition on March 31, 2004, and he now appeals. The district court granted a certificate of appealability on the question of whether petitioner's trial counsel were constitutionally ineffective in failing to uncover and present mitigating evidence during the penalty phase of petitioner's trial. We subsequently amended the certificate to include the question of whether counsel were constitutionally ineffective in failing to develop and present evidence that the shooting was not the cause of Shaw's death. We find no error in the district court's response to these questions and therefore affirm its denial of habeas corpus relief.

I.

Petitioner was indicted for capital murder in the Circuit Court of Jefferson County, Alabama on December 9, 1988. At arraignment, the court appointed Louis Wilkinson ("Wilkinson") to represent petitioner, who was indigent.[2] At

___

[1] For the remainder of this opinion, we refer to Jimmy Dill simply as "petitioner."

[2] Wilkinson was formerly a District Attorney for Jefferson County and had handled several capital murder cases. At trial, Virginia A. Vinson ("Vinson") also represented petitioner;

2

some point during the pretrial proceedings, the parties engaged in plea negotiations. The State offered to take the death penalty off the table if petitioner would plead guilty to "straight murder" and agree to a sentence of life imprisonment with the possibility of parole.[3] Petitioner rejected the State's offer, insisting that he was innocent on the theory that an unknown third party had shot the victim. The case thus proceeded to trial.

## A.

The trial began on May 24, 1989, and lasted three days.[4] The Alabama Court of Criminal Appeals, affirming petitioner's conviction and death sentence, set forth the salient facts as established in the State's case-in-chief during the guilt phase of the trial:

> [T]he victim, Leon Shaw, drove to Terry Dill's house on the afternoon
>
> of February 8, [1988]. Shaw was not supposed to be driving because

Wilkinson, however, handled the majority of the defense's case.

[3] The Alabama's Habitual Felony Offenders Act counseled a life sentence because petitioner had two prior felony convictions. See Ala. Code § 13A-5-9(b).

[4] The State called fourteen witnesses during its case-in-chief. Among them were Sgt. H. Forrest Duncan and Lt. Charles L. Jordan of the Birmingham Police Department, to whom petitioner made a post-arrest statement, claiming that a third party, a black male, was the culprit; Terry Dill, petitioner's nephew; Abbie Dill, Terry Dill's mother and the wife of Lee Henry Dill, petitioner's eldest brother; Junatha Shaw, Leon Shaw's widow; Keith Langford, M.D., Shaw's initial attending physician; Michael W. Gorham, M.D., a surgery resident who also treated Shaw; and Robert Brissie, M.D., the Jefferson County Coroner.

he was serving time at the Federal Work Release Center for a drug violation. Shaw was, however, allowed to leave the center to go to work. He operated the Rose Boutique, which he owned with his wife, Junatha Shaw. Terry Dill left the house and got in the car with Shaw. [Petitioner] was in the front seat with Shaw. Shaw told Terry Dill that [petitioner] wanted to buy drugs from Shaw.

The testimony reveals that Terry Dill was a former cocaine addict who had sold cocaine with Shaw for four years. Shaw would pay Terry Dill to bring him customers.

Shaw, Dill, and [petitioner] ran into Jacqueline Ball and Freddie Carter near a church on 85th Street. Shaw was still driving the car and Terry Dill was sitting in the backseat behind him. [Petitioner] was still in the front passenger seat. Apparently, Shaw and [petitioner] got out of the car. Shaw talked to Jacqueline Ball, and [petitioner] talked to Freddie Carter. Shaw was carrying a black pouch in which he normally kept cocaine and money. Shaw had at least $200 in his hand.

After Ball and Carter left, [petitioner] asked Shaw if he would give him some cocaine until he could get the money to pay for it.

4

Shaw refused. They left for Druid Hills, where the work release center was located, because Shaw had to sign in at the center. When they got to Druid Hills, Shaw's beeper went off. They all got out of the car and Shaw made a telephone call. They went to the Curb Market and Shaw bought wine coolers. Shaw had a "folded wad of money." When they left the store, Shaw had everyone in the car switch places so that the people at the center would not see him driving. Terry Dill was now driving and [petitioner] was in the backseat. Terry Dill drove to the center.

[Petitioner] again asked Shaw for cocaine. Shaw told him that he would give him the cocaine when [petitioner] got some money. He also showed [petitioner] a half ounce of cocaine. [Petitioner] asked for cocaine again when they pulled up to the center. Shaw went to the building. He pulled a "big wad of money" out of his pocket. There was so much money that it could not be rolled up. He told the case manager at the center that he had just left the Rose Boutique and was going to make a deposit.

While Shaw was inside the center, [petitioner] said to Terry Dill, "You don't believe I'll rob him or shoot him." [Petitioner]

5

continued to talk about killing Shaw. When Shaw got back in the car, [petitioner] said that he would shoot Shaw if he did not give him some cocaine. After they drove off, there was a gunshot. Blood spurted onto Terry Dill. [Petitioner] had a small automatic pistol, approximately .25 or .22 caliber. [Petitioner] told Terry Dill to be quiet and keep driving. [Petitioner] pulled the trigger as if he was going to shoot Shaw again. They eventually stopped in an alley. [Petitioner] searched Shaw and took the money and cocaine. [Petitioner] then got a rag and started wiping fingerprints off of the car. Terry Dill ran away. [Petitioner] also ran away. Terry Dill called his girlfriend to pick him up. He went home later that evening.

Dill v. State, 600 So. 2d 343, 350 (Ala. Crim. App. 1991) (record citations omitted).

The court then related petitioner's version of what took place, summarizing the statement that petitioner gave the police on February 18, 1988, which the State introduced into evidence.[5]

---

[5] On February 12, four days after Shaw was shot, Terry Dill spoke to Shaw's wife, Junatha Shaw and, later the same day, contacted the Birmingham police. On February 18, the police contacted petitioner, who voluntarily went to the station house and made the statement

6

[Petitioner] stated that he and Terry Dill were with Shaw and that they drove to North Birmingham. Terry Dill was driving the car, Shaw was on the front passenger seat, and [petitioner] was in the backseat behind Terry Dill. [Petitioner] stated that Shaw's door opened and that he heard a shot from behind Shaw. [Petitioner] was then asked how Shaw was shot from behind without the window being shot out of the car. [Petitioner] then stated that Shaw was actually getting into the car when someone ran up to Shaw's door. [Petitioner] stated that he heard a gunshot. He and Terry Dill got out and ran. [Petitioner] then stated that after hearing the shot, they drove off and a car followed them. They drove to an alley, jumped out of the car, and ran away. [Petitioner] stated that Shaw had some cocaine in a black bag but he did not see any money.

Id. at 351.

A woman who lived near the site of the shooting saw the car in the alley, watched the two men leave the scene, and summoned the police, who, upon finding Shaw and realizing that he was bleeding profusely, called for an ambulance. The court described what took place thereafter, including the circumstances that led to Shaw's death:

Shaw was taken to the [University Hospital of Birmingham] where emergency brain surgery was performed. The bullet entered the left, back side of his brain. Shaw was unconscious. He had abnormal movement in his extremities which indicates that the brain is functioning extremely abnormally. Both a feeding tube and breathing tube were inserted. He was discharged from the hospital on April 26, [1988], because there was nothing more the hospital could do for him. Shaw could not function independently and required round-the-clock

---

described above.

7

care. Shaw eventually pulled the feeding tube out.[6] However, his doctor said he would not replace the tube since he could eat and drink by mouth. Shaw was readmitted to the hospital on October 31, [1988]. He never regained consciousness and died on November 22, [1988]. Shaw's doctors testified that he died of complications from a gunshot wound to the head.

Forensic evidence revealed that the bullet removed from Shaw's head was consistent with a .22 caliber projectile. The characteristics of the wound were consistent with a contact gunshot wound.

Id. at 350–51.

### B.

After the State rested its case, petitioner moved the court for a judgment of acquittal. The court denied the motion.[7] In closing argument to the jury, the prosecutor contended that the forensic evidence, which indicated that the fatal shot had been fired from the back seat of the car, corroborated Terry Dill's explanation of how the shooting occurred. Wilkinson, in rebuttal,[8] disagreed: "[Petitioner] was consistent in one thing, that an unknown black male that Shaw had stopped to

---

[6] The issue of how Shaw's feeding tube became displaced is disputed in the instant habeas proceeding. We discuss this dispute in disposing of the issue of whether petitioner's counsel were ineffective in failing to present evidence on Shaw's cause of death.

[7] At that point, in the absence of the jury, the court asked petitioner's counsel, Wilkinson, whether the defense would be presenting any evidence, and Wilkinson replied that it would not:

THE COURT: All right. The State has rested. Anything for the defendant?

MR. WILKINSON: Judge, on behalf of the defendant I know of no further new evidence that we could present, and we rest, Your Honor.

[8] The defense's rebuttal to the prosecution's closing argument was split between Vinson, who began, and Wilkinson, who concluded.

8

talk to shot Shaw. He said that [in his post-arrest statement to the police]. And that fits in very well with the facts, physical and otherwise, and just as well as anything Terry Dill said."[9]

The jury found petitioner guilty as charged.[10] After a brief recess, the jury returned for the penalty phase of the trial.[11] The State put on one witness in its case, parole officer Carl Michael Newman. Newman testified that petitioner had two Alabama felony convictions and was on parole at the time Shaw was shot.[12]

---

[9] This explanation of the shooting was consistent with the position Wilkinson took in his opening statement to the jury at the outset of the trial. There, Wilkinson focused on the theory that an "unknown black male" was involved in the shooting. He said, "Who killed [Shaw] and why, we could speculate on, we could conjecture about, maybe you all will conclude as to why. But we're only here about [petitioner] and whether or not he should face capital murder, the death penalty, for killing someone that he did not kill."

[10] The jury deliberated for an hour and 35 minutes, from 2:05 to 3:40 p.m.

[11] Before the jury returned to the courtroom, the court and defense counsel engaged in the following colloquy about mitigating circumstances:

| | |
|---|---|
| THE COURT: | What about mitigating circumstances? |
| MR. WILKINSON: | Which can be almost anything. |
| MS. VINSON: | Yes. It can be almost anything. Not enumerated, but I think a separate statute says any circumstances of the offense can be considered mitigating circumstances. |
| MR. WILKINSON: | Or I suppose you might have three, might have five, might have six. I don't know. Actually we were just blank on submitting it, you know, a statement to the jury. We're just submitting it to them. And if [petitioner] wanted to make a statement on his own behalf, he can. But that was all. We were blank on doing it. |

[12] The State submitted into evidence certified copies of the two convictions. The certified copies indicated that on October 4, 1983, petitioner was convicted of theft of property in the first degree and, on December 9, 1983, was sentenced to prison for a term of ten years. On the same day he was sentenced for the first conviction, petitioner pled guilty to second degree robbery and was sentenced to a concurrent ten-year prison term. Petitioner was on parole on

9

The defense likewise presented one witness, petitioner. His testimony was brief. Petitioner indicated that he had a thirteen-month old child, a common-law wife, had worked a number of jobs, and attended nursing school while on parole.

In its closing argument to the jury, the State argued that the evidence (introduced during both the guilt and penalty phases of trial) established three aggravating circumstances: the offense had been committed by a person (1) who was under a sentence of imprisonment; (2) who had been previously convicted of a felony involving the use or threat of violence to the person; and (3) who, at the time of the murder, was engaged in the commission of a robbery.[13] As a result, the prosecution argued, the jury should return a death penalty verdict. Wilkinson, relying on petitioner's testimony, urged the jury to recommend a life sentence. The jury found the aggravating circumstances the State had cited, and, therefore, returned a verdict calling for the death sentence.[14]

---

February 8, 1988, when the Shaw shooting occurred. His parole was revoked on March 15, 1988.

[13] Under Alabama law, aggravating circumstances authorizing the imposition of the death sentence include the following: "(1) The capital offense was committed by a person under sentence of imprisonment"; "(2) The defendant was previously convicted of . . . a felony involving the use or threat of violence to the person"; and "(4) The capital offense was committed while the defendant was engaged . . . in the commission of . . . robbery." Ala. Code § 13A-5-49.

[14] The jury voted 11 to 1 in favor of the death penalty.

The court sentenced petitioner on July 14, 1989, in accordance with the jury's verdict.[15] The court based its sentence on the same aggravating circumstances the jury had found, and the absence of any mitigating circumstances.

## C.

Petitioner appealed his conviction and sentence.[16] The Alabama Court of Criminal Appeals affirmed, Dill v. State, 600 So. 2d 343 (Ala. Crim. App. 1991), as did the Alabama Supreme Court, Dill v. State (Ex parte Dill), 600 So. 2d 372 (Ala. 1992). The United States Supreme Court denied certiorari. Dill v. Alabama, 507 U.S. 924, 113 S. Ct. 1293, 122 L. Ed. 2d 684 (1993).

On July 1, 1994, proceeding under Rule 32 of the Alabama Rules of Criminal Procedure,[17] petitioner returned to the Circuit Court of Jefferson County,

---

[15] Prior to sentencing, a pre-sentence investigation was conducted and a report thereof was submitted to the court and parties. During the sentencing hearing, defense counsel, arguing for a sentence of life imprisonment, raised two points: (1) that other cases in which the death penalty was imposed were "more extreme as far as the cruelty [and] viciousness of the act" than the case at hand, and (2) that the victim was "a person who dealt dope to the defendant," and thus bore "great responsibility in that whole set of affairs."

[16] The issues petitioner raised on direct appeal are not pertinent to our disposition of the instant appeal.

[17] Rule 32 generally allows "any defendant who has been convicted of a criminal offense [to] institute a proceeding in the court of original conviction to secure appropriate relief" on various grounds, including that "[t]he constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief." Ala. R. Crim. P. 32.1. Petitioner's Rule 32 petition was handled by the same judge who had presided over his trial.

asking that court to set aside his conviction and sentence.[18] His petition contained

forty-nine claims based on the Fifth, Sixth, Eighth, and Fourteenth Amendments

of the United States Constitution[19] and article I, section 6 of the Alabama

Constitution, and it was supported by six affidavits.[20] On September 14, 1994, the

court denied the Rule 32 petition without holding an evidentiary hearing.[21]

---

[18] The petition was prepared and filed by attorneys F. Hampton McFadden and Edwin O. Rogers. Several other lawyers subsequently represented petitioner as he pursued Rule 32 relief. Peter H. Burke and Edwin O. Rogers handled his appeal of the circuit court's September 14, 1994 ruling denying the petition. On remand from the court of criminal appeals, Michael Bevers and L. Dan Turberville represented petitioner at his Rule 32 hearing.

[19] The only claims pertinent to the instant appeal are the two claims designated in the certificate of appealability, as amended.

[20] These affidavits were executed during the period of May 3–June 29, 1994. Of the six affiants, two had testified for the State in the guilt phase of petitioner's trial: Terry Dill and Abbie Dill (Terry Dill's mother and petitioner's sister-in-law). One affiant – petitioner – had testified in the penalty phase of the trial. The three remaining affiants, none of whom had testified at the trial, were Angela Johnson (petitioner's common-law wife), Dr. Alwyn Shugerman (the physician who attended to Leon Shaw after he returned to the hospital on October 31, 1988), and Cheryl Wilkinson-Simonetti (the attorney appointed to represent petitioner after he was charged with the robbery of Shaw, prior to Shaw's death).
  Collectively, the affidavits indicated that petitioner had consumed beer and had intravenously taken "several doses of cocaine" during the night and morning preceding his post-arrest statement to the police; Shaw had made "good progress" after his return home from the hospital in April 1988; Shaw's wife, Junatha Shaw, who had a live-in boyfriend while she was caring for her husband between his hospitalizations, failed to take care of her husband properly following his discharge from the hospital on April 26, 1988; "severe dehydration . . . along with the other related derangements, was a primary cause of Shaw's death" (according to Dr. Shugerman's affidavit); and petitioner took good care of his common-law wife, Angela Johnson, prior to his arrest. In addition, each affiant stated that he or she either had limited contact or no contact with defense counsel prior to petitioner's trial.

[21] In relevant part, Ala. R. Crim. P. 32.9 states: "Unless the court dismisses the petition, petitioner shall be entitled to an evidentiary hearing to determine disputed issues of material fact, with the right to subpoena material witnesses on his behalf. The court in its discretion may take evidence by affidavits, written interrogatories, or depositions, in lieu of an evidentiary hearing, in

Petitioner appealed the ruling.  On July 7, 1995, the Alabama Court of Criminal

Appeals vacated the ruling in part, and remanded the case to the circuit court for

an evidentiary hearing on petitioner's ineffective assistance of counsel claims.[22]

Dill v. State, 717 So. 2d 826, 827 (Ala. Crim. App. 1995).

The circuit court convened a Rule 32 hearing to address those claims on

September 13, 1996.  After the court announced the purpose of the hearing,

petitioner's attorney, Michael Bevers, objected to going forward with the hearing

on the ground that petitioner was not present.  The transcript of the hearing

records his objection and the court's responses, as follows:

> MR. BEVERS: For the record we would move to object that [petitioner]
>        was not brought here to the courtroom and he's not

---

which event the presence of the petitioner is not required, or the court may take some evidence
by such means and other evidence in an evidentiary hearing." Ala. R. Crim. P. 32.9(a) (emphasis
added).

[22] Petitioner claimed that his trial counsel failed (1) to investigate and prepare petitioner's
case for trial; (2) to ensure that petitioner received the psychiatric examination the trial court
ordered; (3) to ask the venire persons in voir dire whether any of them had fixed opinions in
favor of the death penalty; (4) to strike biased jurors who eventually were empaneled; (5)
adequately to represent petitioner at trial; (6) to object to numerous instances of prosecutorial
misconduct and the admission of inadmissible evidence; (7) to claim a variance between the
indictment and the proof; (8) to request necessary jury instructions; (9) to conduct an adequate
investigation for the sentencing phase; and (10) to include in a motion for a new trial the
constitutional violations enumerated in petitioner's Rule 32 petition.
  At the evidentiary hearing the circuit court held on September 13, 1996, the above claims
were effectively reduced to the two claims now before us, as indicated in our introduction to this
opinion and in our treatment of the merits of this appeal: whether counsel were deficient in
failing to present evidence that the cause of Shaw's death was not the bullet wound he suffered
but severe dehydration, and whether counsel should have presented the mitigating evidence
reflected in the affidavits supporting his Rule 32 petition.

13

|  | present. |
| THE COURT: | Where is he? |
| MR. BEVERS: | He's in prison in West Jefferson. |
| THE COURT: | There was no request that he be here, otherwise I would have had him here. |
| MR. BEVERS: | Would that have been our duty to request that, Your Honor? |
| THE COURT: | Yes, sir. |
| MR. BEVERS: | Very well. |

Bevers did not request a continuance (in order to obtain petitioner's presence), so the hearing continued.[23]

Petitioner's counsel presented no live testimony to support petitioner's petition. Instead, counsel relied on the six affidavits attached to the originally-filed petition, as well as later-filed affidavits[24] from six persons related to petitioner by blood or marriage: Leonard Dill, Lee Henry Dill, and Archie Dill (petitioner's brothers), Abbie Dill (Lee Henry Dill's wife), Carolyn Elaine Dill (Archie Dill's wife), and Angela Johnson Whaley (petitioner's former common-law wife, who presumably married a man surnamed Whaley after executing the earlier affidavit).[25] The substance of these later-filed affidavits was that petitioner

---

[23]  When the hearing began, at 10:10 a.m., Bevers's co-counsel, Turberville, was not present. When Turberville's participation (in an argument) became necessary, the court recessed the proceeding until 2:34 p.m., at which time both attorneys were in attendance.

[24] These affidavits were all taken during the period of May 15–24, 1996.

[25]  The affidavits of Abbie Dill and Angela Johnson Whaley supplemented the affidavits they had given earlier, which were attached to the Rule 32 petition when it was filed on July 1, 1994.

14

had been a good person until he began his drug use, and that he had cared for his ailing, arthritic mother, who died in October of 1984 while he was in prison. Counsel also relied on the affidavit of Dr. Alwyn Shugerman.[26] In that later affidavit, which supplemented the affidavit he executed on June 14, 1994, Shugerman stated that "the immediate cause of [Shaw's] death was severe metabolic derangement and multiple organ failure associated with severe dehydration."[27]

The State presented no evidence, in the form of either live testimony or affidavit, in opposition to petitioner's Rule 32 petition. Rather, it argued that petitioner had failed to adduce sufficient evidence to make out a prima facie case that the performance of his attorneys did not pass constitutional muster.

On October 9, 1996, the circuit court denied the Rule 32 relief petitioner was seeking.[28] Petitioner appealed, and the Alabama Court of Criminal Appeals

---

[26] Dr. Shugerman's later-filed affidavit, which he executed on July 13, 1996, was attached to a motion that petitioner's counsel filed prior to the Rule 32 hearing. In that motion, counsel sought leave of court to take Shugerman's deposition. The court denied the motion during the Rule 32 hearing.

[27] Dr. Shugerman based his opinion on his "current review of the available medical hospital record," the only reliable information about the patient at hand given that Shaw had died eight years previously. In his earlier affidavit, see supra note 22, Shugerman said that "severe dehydration . . . along with the other related derangements, was a primary cause of Shaw's death."

[28] In denying relief, the Rule 32 court focused on the three ineffective assistance of counsel claims raised by petitioner during the hearing: (1) trial counsel's failure to call Dr.

15

affirmed on March 26, 1999. <u>Dill v. State</u>, 767 So. 2d 366 (Ala. Crim. App.

1999). On March 31, 2000, the Alabama Supreme Court denied certiorari.

D.

On March 30, 2001, his state remedies having been exhausted, petitioner

sought a writ of habeas corpus in the United States District Court for the Northern

District of Alabama, pursuant to 28 U.S.C. § 2254. His petition contained several

claims for relief, two of which are pertinent here: his attorneys rendered

ineffective assistance of counsel by failing (1) to call Dr. Shugerman as a witness

during the guilt phase of the trial to testify that Shaw died of severe dehydration;

and (2) to uncover and present mitigating evidence during the penalty phase of the

trial.[29] Relying on the record of the Rule 32 proceeding, including the circuit

court's dispositive order and the opinion of the court of criminal appeals, the

district court denied relief.

---

Shugerman to testify as to the victim's cause of death; (2) trial counsel's failure to follow up on the psychiatric examination of the defendant for use in the guilt phase or sentencing phase of the trial; and (3) trial counsel's failure to call mitigating witnesses during the sentencing phase. We set forth the relevant findings of fact from both the circuit court as well as the court of criminal appeals in our analysis of petitioner's claims in part III, <u>infra</u>.

[29] In addition to these claims, petitioner alleged that (1) the prosecutor's peremptory challenges were racially biased; (2) the trial judge empaneled one of his relatives as a juror; (3) the State failed to turn over materials it compiled while investigating whether Shaw's wife purposefully or negligently caused the Shaw's death; (4) the trial judge failed to grant a mistrial after an investigating police officer referred to the defendant's prior criminal record in the presence of the jury; and (5) prosecutorial misconduct precluded a fair trial.

16

II.

A.

Our consideration of petitioner's ineffective assistance of counsel claims is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 214, which circumscribes federal court review in deference to the state courts. Bell v. Cone, 535 U.S. 685, 693, 122 S. Ct. 1843, 1849, 152 L. Ed. 2d 914 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403–04, 120 S. Ct. 1495, 1518, 146 L. Ed. 2d 389 (2000)) ("[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."); Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002).

Pursuant to AEDPA, a federal court may only grant habeas relief with respect to a claim adjudicated in state court if the state court proceedings: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

17

For the purposes of § 2254(d)(1), a state court decision is "contrary to" clearly established federal law where the state court: (1) applied a rule in contradiction to governing Supreme Court case law; or (2) arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts.[30] Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006); Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000). An "unreasonable application" of clearly established federal law may arise where a state court: (1) correctly identifies a legal rule from Supreme Court precedent, but unreasonably applies that rule to the court's factual findings; or (2) unreasonably extends or declines to extend a legal rule from Supreme Court precedent to a new factual context. Jones, 436 F.3d at 1293.

Significantly, AEDPA codifies a presumption that the factual findings of state courts are correct, which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003). This presumption of correctness applies both to findings of fact made by the state trial court as well as the state appellate court. Bui, 321 F.3d at 1312.

B.

---

[30] Likewise, where "grave doubt" exists as to whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply, and we review the issue de novo. Romine v. Head, 253 F.3d 1349, 1365 (11th Cir. 2001).

When considering the merits of an ineffective assistance of counsel claim, we turn to the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which both the Alabama courts and the district court applied here.  The Strickland test requires petitioner to show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense such that petitioner was deprived of a fair trial.  Id. at 687, 104 S.Ct. at 2064.  The standard we apply in assessing the first prong is that of a reasonable attorney, not a paragon of the bar.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").  Trial counsel's representation is generally deemed reasonable where the decision being challenged was made in the execution of trial strategy.  Id. at 690–91, 104 S. Ct. at 2066.

In judging whether trial counsel acted reasonably, we typically rely on two sources: petitioner's own testimony as to conversations that took place between petitioner and counsel concerning the pretrial investigation of the case and trial strategy, and the counsel's own explanation as to what took place.  See Chandler, 218 F.3d at 1318–19 (en banc) ("[An] inquiry into counsel's conversations with the [petitioner] may be critical."); see Rompilla v. Beard, 545 U.S. 374, 385, 125

19

S. Ct. 2456, 2464, 162 L. Ed. 2d 360 (2005) (recounting the testimony of trial counsel during post-conviction proceedings); Wiggins v. Smith, 539 U.S. 510, 517, 123 S. Ct. 2527, 2533, 156 L. Ed. 2d 471 (2003) (same). The challenge faced by the Alabama courts, and the challenge we confront in this appeal, is that neither petitioner nor his trial counsel testified during the Rule 32 hearing.

Despite the lack of live testimony from either petitioner or his counsel, we are not without a basis on which to review the district court's disposition of his claims. Both the Rule 32 court and the court of criminal appeals made explicit findings of fact to which we accord deference under AEDPA. 28 U.S.C. § 2254(e)(1); Bui, 321 F.3d at 1312.

We examine first the claim that counsel were ineffective for failing to call Dr. Shugerman during the guilt phase of the trial to establish a reasonable doubt as to whether the bullet wound caused the victim's death. Next, we consider the claim that counsel were ineffective for failing to seek and present mitigating evidence during the penalty phase of the trial.

## III.

### A.

Petitioner argues that his trial counsel were ineffective during the guilt phase of the trial because they failed to uncover and present evidence that Shaw's

20

death was caused by dehydration while under the care of Shaw's wife, rather than the gunshot wound.[31] In support of this claim, petitioner points specifically to: (1) the failure of petitioner's trial counsel to call to the stand Dr. Alwyn A. Shugerman, the attending physician after Shaw's October re-admission into the hospital, who would have testified that Shaw died of severe dehydration; (2) evidence in Shaw's medical records indicating that Shaw's physical condition improved after his April discharge from the hospital; and (3) affidavits noting that Shaw's wife, Junatha Shaw, was involved in an extra-marital affair, and implying that she deprived her husband of requisite food and water while he was under her

---

[31] In both the state Rule 32 and federal habeas proceedings, petitioner articulated this claim as a failure of trial counsel to investigate and present evidence regarding the victim's cause of death without specifying whether the question pertained to the guilt phase of the trial or the penalty phase. Noting this ambiguity, the State argued in its response brief for this appeal that on the basis of procedural default, we need not consider any claim that petitioner's trial counsel were ineffective because they failed to present evidence of an intervening cause of death during the penalty phase of the trial. See Hallford v. Culliver, 459 F.3d 1193, 1199 n.4 (11th Cir. 2006) (citing Collier v. Jones, 910 F.2d 770, 772) (11th Cir. 1990)) (holding that where a petitioner fails to raise a claim in state court under proper state procedure, the doctrine of procedural default precludes a federal court from considering that claim). Responding to the State in his reply brief, petitioner made no mention of the procedural default issue.

Although we may apply de novo review to the question of whether a habeas petitioner's claim is procedurally defaulted, Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001), we decline to address the procedural default issue here. Neither the Rule 32 petition nor the federal habeas petition discusses the claim with reference to the penalty phase of the trial. Indeed, although not explicit in his federal habeas petition, petitioner argues that his trial counsel failed to investigate the issue of the cause of Shaw's death underneath the broader framework of ineffective assistance of trial counsel during the guilt phase. We assume, therefore, that despite the lack of precision in drafting the claim, petitioner never intended this claim to be broader in scope than the guilt phase of the trial. That said, we need not tarry over the application of procedural default.

21

care. Failure to look for and convey this information at trial, petitioner posits, resulted in a constitutionally deficient defense on the part of his trial attorneys and materially affected the outcome of his case.

During the Rule 32 proceedings, and after conducting the hearing on remand, the circuit court made specific findings of fact based on the trial record. In addressing petitioner's claim, the court bypassed the question of whether counsel were deficient in failing to pursue a causation defense through Shugerman and proceeded directly to the question of whether counsel's failure to call Shugerman prejudiced petitioner's case. The court found no prejudice. First, "all of [Shugerman's] records of [Shaw's] treatment were admitted" into evidence through the testimony of Dr. Langford. Second, Dr. Langford and Dr. Brissie (the County Coroner) both opined that the "cause of death was a gunshot wound to the head." Third, Shugerman's testimony would not have "changed or altered" that opinion.

The court of criminal appeals similarly found that petitioner had not met his burden of showing both deficient counsel and resulting prejudice under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The court of criminal appeals held that the decision not to call Shugerman was a strategic decision which it could not find unreasonable. That is, "[c]ounsel may have

22

believed" that Dr. Shugerman's potential testimony, focusing the jury's attention on the circumstances surrounding the victim's death, "would have generated more sympathy for the victim." Dill v. State, 767 So. 2d 366, 373 (Ala. Crim. App. 1999). Moreover, "Dr. Shugerman's testimony would, at best, [have been] cumulative of other evidence already admitted [and] substantially mirror[ed] the testimony presented at trial by Dr. Langford and Dr. Brissie." Id. The court explained that Shugerman's testimony would not have changed the outcome of the trial.

First, the testimony established that an injury such as the one Shaw sustained was "generally not survivable." Id. at 372 (quoting Dill, 600 So. 2d at 359). As a result, the court deemed that any dehydration Shaw suffered was, at most, a "concurrent cause" of Shaw's death under Alabama law, and insufficient by itself to have caused death. Id. at 373 (quoting Dill, 600 So. 2d at 359) ("Where, as here, the wound inflicted by [petitioner] upon the victim is dangerous to life, the fact that there are other causes of death does not prevent such wound from being the legal cause of death."); see Ala. Code § 13A-2-5(a) ("A person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly

23

insufficient."). Second, the court noted that in reviewing petitioner's conviction on direct appeal, it had rejected petitioner's substantive argument that the bullet wound was not a cause of Shaw's death. Id.; cf. Dill, 600 So. 2d at 359 ("There was no evidence presented from which the jury could have reasonably inferred that [petitioner] shot Shaw but that something else caused his death."). The court of criminal appeals, therefore, agreed with the circuit court that counsel's failure to call Dr. Shugerman had no affect on the outcome of petitioner's trial. Dill, 767 So. 2d at 373–74. The district court reached the same conclusion, determining that the state court's findings under Strickland were not objectively unreasonable, and we agree.

First, petitioner has not carried his burden of showing that his trial counsel were deficient – that they acted unreasonably – in searching for and presenting evidence relevant to the cause of Shaw's death. Neither petitioner nor his attorneys testified during the Rule 32 hearing, and therefore, the court had no evidence before it to assess whether, as a strategic matter, his attorneys should have attacked the State's position that the gunshot caused the victim's death. See Rompilla v. Beard, 545 U.S. 374, 385, 125 S. Ct. 2456, 2464, 162 L. Ed. 2d 360 (2005) (recounting the testimony of trial counsel); Wiggins v. Smith, 539 U.S. 510, 517, 123 S. Ct. 2527, 2533, 156 L. Ed. 2d 471 (2003) (same); see also

24

Chandler v. United States, 218 F.3d 1305, 1318 (11th Cir. 2000) (en banc) (stressing the importance of "information supplied by the [petitioner]" or "the [petitioner's] own statements or actions"). The strategy that the defense did take, moreover, is clear from the trial transcript – it maintained throughout the proceedings that petitioner did not shoot Shaw.

We must still query, however, whether petitioner's trial counsel should have called Shugerman to testify that even if petitioner were the shooter, Shaw died as a result of dehydration while under the care of his wife, Junatha Shaw. From the record at trial, it appears that counsel eschewed the alternative theory, opting instead to argue petitioner's innocence from start to finish. Presuming that the Rule 32 court properly found that Shugerman's testimony would not have controverted the State's theory that Shaw died as a result of the gunshot wound, we discern two main reasons why counsel acted reasonably: (1) there is no deficiency in failing to pursue an alternative, unavailing argument; and (2) calling Shugerman to testify could undermine petitioner's core defense of innocence.[32]

---

[32] We note that the Alabama Court of Criminal Appeals articulated a third, ancillary reason why we may conclude that petitioner's counsel were not constitutionally deficient – calling Shugerman to testify might have drawn the jury's attention to Shaw's diminished quality of life after the shooting, thus bolstering the State's case by eliciting more sympathy for the victim. The court stated that strategy may have guided trial counsel's decision not to focus on the immediate cause of death: "A review of the totality of the circumstances surrounding the victim's death indicates that because of the shotgun wound, the victim's quality of life gradually diminished to the point that the victim, who had a wife and children, was no longer a productive

25

See Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (applying a presumption of correctness under § 2254(e)(1) to findings of fact by a state trial court).

In light of the reasonableness standard set forth by the Strickland Court, our circuit maintains that constitutionally sufficient assistance of counsel does not require presenting an alternative – not to mention unavailing or inconsistent – theory of the case. See Johnson v. Alabama, 256 F.3d 1156, 1178 (11th Cir. 2001) (finding no ineffective assistance of counsel where a petitioner's "now-preferred 'third man' defense" was "not compatible" with the information he conveyed to trial counsel when formulating strategy pre-trial); Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000) (finding no ineffective assistance of counsel where a reasonable attorney could have deemed an alternative theory "inconsistent with Petitioner's own description of the killing"). That is, we will not find ineffective assistance of counsel simply because a petitioner's counsel failed to chronicle every possible theory of the relevant facts. See Chandler, 218 F.3d at 1318 (en banc) ("[C]ounsel's reliance on particular lines of defense to the exclusion of others – whether or not he investigated those other defenses – is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in

member of society. Counsel may have believed this testimony would have generated more sympathy for the victim." Dill, 767 So. 2d at 373.

itself, was unreasonable."). Reasonableness, indeed, suggests that a trial counsel would weigh competing theories and choose to present the most compelling theory among the various options. Id. at 1315 n.16. Petitioner's constitutional right to effective assistance of counsel did not require counsel to channel Scheherazade in recounting myriad possible theories.

Furthermore, calling Shugerman to testify that Shaw died of dehydration would likely have undermined petitioner's innocence defense, which hinged on the factual details surrounding the gunshot. At trial, both the State and petitioner's counsel focused on the shooting as the fulcrum of the capital murder charge. The State's case with regard to Shaw's cause of death turned on two lines of evidence: (1) Terry Dill's first-person account of the events; and (2) medical evidence substantiated by the testimonies of State witnesses Dr. Keith Langford, Dr. Michael W. Gorham, and Dr. Robert Brissie. When Terry Dill testified for the State, he implicated petitioner as Shaw's shooter,[33] and the State portrayed Terry Dill as the witness on whose testimony the entire case hinged.[34] The medical

---

[33] Upon being asked whether he saw petitioner "actually pull the trigger," Terry Dill responded, "Yes, ma'am. . . . 'Cause the gun he had like that, and when he came up he shot. He shot right there and pulled it back. And he said now it's over, I told y'all I ain't bull shitting, like that."

[34] The State emphasized the significance of Terry Dill's testimony to the point of discrediting other State witnesses. During closing argument, the State declared, "Terry Dill was the only one to tell you from the witness stand the whole truth and nothing but the truth that yes,

27

testimony from Langford, Gorham, and Brissie likewise focused on the details of Shaw's gunshot injury. Each of these doctors made assessments based both on personal interaction with the patient[35] and Shaw's discharge summary, which was completed by Shugerman after Shaw's death on November 22, 1988.[36] Both Langford[37] and Gorham testified that Shaw's gunshot wound to the head and brain presented an injury that was "generally not survivable" because the bullet's "passage through the brain went through a lot of tissue which is very vital to a worthwhile survival of a patient." Upon reviewing the forensic report, Brissie, the coroner of Jefferson County, surmised that the wounding pattern on Shaw's skull was consistent with that of a contact gunshot wound, "where the muzzle of the

---

indeed, Leon Shaw and I did drugs together, sold drugs together . . . . Terry is trying to help Leon. He is a friend of his. And he is trying to do the right thing. He is trying to do what his Mama told him, tell the truth."

[35] The doctors who served as State witnesses were not, however, present at all stages of Shaw's time at the hospital. Langford was not involved in Shaw's treatment upon re-admission into the hospital on October 31, 1988.

[36] The discharge summary detailed Shaw's patient progress from the date of his admission to the hospital on October 31, 1988 until his death on November 22, 1988.

[37] Langford indicated that he was the attending physician when Shaw entered the University Hospital of Birmingham on February 8, 1988. He saw Leon Shaw on a regular basis while he was in the hospital, or until his April release. During that time, Langford saw "[v]ery little" progress in Shaw's condition, noting that although Shaw became "much more responsive," he "never at any time reached the stage of appearing to be aware of his surroundings or the people who were looking after him." After his outpatient release, Langford remembers one time during which he saw Leon Shaw in person.

firearm in question is in contact with the surface of the skin." Brissie's autopsy[38]

caused him to conclude that a .22 caliber bullet penetrated the left rear portion of

Shaw's head and proceeded upward to enter the area of the midbrain.[39] All three

State medical witnesses indicated that a gunshot wound such as the kind sustained

by Shaw would be nearly universally fatal at or near the time of infliction.[40]

For their part, petitioner's attorneys maintained a specific theory in their

client's defense: an "unknown black male" that Shaw stopped to speak to had shot

Shaw.[41] Rather than attempting to set forth an alternative cause of death, upon

cross-examination of the doctors, counsel focused on the powder burns Shaw

sustained from the gunshot,[42] and sought to cast doubt on the notion that anyone

---

[38] In preparing for his autopsy, Brissie consulted and read Shaw's relevant hospital records.

[39] According to the facts as set forth by the court of criminal appeals on direct appeal, at the time that the three men were leaving the work release center, Shaw was sitting in the front right passenger seat, Terry Dill was driving, and petitioner was sitting in the back of the vehicle, behind Terry Dill. Dill, 600 So. 2d at 351.

[40] Brissie declared: "[O]ne almost never examines a brain where a bullet or projectile has penetrated such a vital area as the midbrain where they survived for any appreciable interval."

[41] In closing argument at the conclusion of the guilt phase, Vinson pointed to the reasonable doubt that petitioner was the shooter: "Maybe the assailant didn't have any prints on that car. You know, we don't know about that. There are a lot of things we don't know about this case." Later, Wilkinson added: "What evidence do you have that he, [petitioner], the person you are trying, shot anybody?"

[42] Gorham noted during direct examination that "there was [gun]powder in the fat under the skin and powder in a layer called the galea, which is a layer of tissue just over the skull, in the bullet entrance wound."

given petitioner's proximity in the vehicle could have shot a gun to inflict the type of injury Shaw received.[43] During closing arguments, both the prosecutor[44] and defense counsel[45] seemed to focus on the gunshot wound as the cause of capital murder.

Finally, the fact that both the defense and the prosecution focused on the gunshot wound as central to the capital murder charge comports with the requirements of the Alabama Criminal Code. The evidence at trial was overwhelming that Shaw would not have died "but for" the gunshot wound, and that, even if a concurrent cause existed, the gunshot wound was not "clearly insufficient" as a cause of Shaw's death. See Ala. Code § 13A-2-5(a). Even were

---

[43] During cross-examination of Brissie, Wilkinson sought to undermine the validity of Brissie's conclusion that the injury had been a "contact gunshot wound." According to the relevant exchange:

| | |
|---|---|
| BRISSIE: | Well, one would expect a particular stipple pattern or powder tatoo [sic] pattern at one to two feet. If we're talking about contact wounds, that would be muzzle to skin contact. |
| WILKINSON: | Right. And, of course, from your observation and from the hospital records, you have no way to make any surmise about that, do you? |
| BRISSIE: | I did not read on any part of the hospital records notations specifically about apparent powder burns[.] |

[44] According to the State counsel: "It's all in one course of events, it's connected, directly connected, continuous chain of events. And when he pulled the gun the robbery began. And that is capital murder."

[45] For their part, the defense counsel queried: "What evidence do you have that [petitioner] ever had a gun in his possession, ever owned a gun, ever touched a gun, ever fired a gun? You have the word of Terry Dill period."

30

Shugerman to have testified that the "immediate cause" of Shaw's death was "severe dehydration," his testimony would not have eliminated the proposition that under Alabama law, the gunshot wound would still have sufficed to subject petitioner to potential criminal liability for Shaw's death. The same runs true for any intimation that Shaw's wife neglected Shaw, resulting in his dehydration – were such evidence to have been introduced at trial, it would not have undermined the substantial evidence establishing that Shaw died as a result of being shot.

Given the defense's theory of the case and the requirements of the Alabama Criminal Code, we agree with the district court that it would have been "extremely awkward" – not to mention unavailing – for counsel to have set forth a separate line of defense suggesting that even though petitioner had not shot anyone, Shaw's wife was to blame for inappropriate care that led to Shaw's death by dehydration.[46] The trial transcript is clear that counsel made a tactical decision to pursue the theory that petitioner did not shoot Shaw, a reasonable decision given that the gunshot wound met the causation requirements set forth by Alabama law. We conclude that petitioner failed to carry his burden of showing that his attorneys were constitutionally deficient for failing to call Shugerman as a witness to testify

---

[46] During its case-in-chief, the State called Junatha Shaw as a witness, and although she testified as to her care of her husband after the shooting, defense counsel, on cross-examination, did not address the subject.

31

as to the cause of Shaw's death.

Second, even were we to assume, <u>arguendo</u>, that counsel were constitutionally deficient in not pursuing the argument that Shaw died due to dehydration, we also find that petitioner failed to meet his burden of proving prejudice. The outcome of his trial would not have been different had counsel challenged the State's theory of the cause of Shaw's death. Although Shugerman was not called as a witness, the records of his treatment were admitted through Langford, who also treated Shaw. As discussed above, moreover, any theory that Shaw's immediate cause of death was severe dehydration could not satisfy the causation requirements set forth in the Alabama Criminal Code. <u>See</u> Ala. Code § 13A-2-5(a) ("A person is criminally liable if the result would not have occurred but for his conduct . . . unless [a] concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient."). We agree with the state courts that the failure of petitioner's attorneys to present testimony that dehydration caused Shaw's death was not unreasonable, and did not affect the trial's outcome.

### B.

Petitioner also contends that his attorneys were ineffective during the sentencing phase of the trial because they failed to seek and then present

mitigating evidence. Specifically, petitioner posits that counsel were ineffective because they failed to locate and present witnesses who would have testified to his lack of aggression, concern and care for family, his "relative success" in achieving sobriety and self-improvement, and his good character until drug use began. The witnesses whom petitioner suggests could provide such testimony consist almost entirely of family members.[47] Petitioner contends that the failure to uncover and present this mitigating evidence resulted in a constitutionally deficient defense, and materially affected the outcome of his case.

During the Rule 32 proceedings, the circuit court found that "all but one of [the affiants] are family members of the defendant who would have testified that defendant was a good person until he began to use drugs," that counsel could not be considered deficient for not having called such witnesses, and that even if counsel were deficient, the defendant was not prejudiced as a result. The court of criminal appeals agreed, holding that the testimony of the affiants "would not have changed the balance of mitigating and aggravating circumstances" or the "outcome of the sentencing proceeding." Dill, 767 So. 2d at 372. Petitioner's claim that counsel were derelict in failing to uncover and present the testimony of

_____

[47] We discuss the identity of the affiants and the substance of the affidavits petitioner proffered during the Rule 32 proceedings in greater detail when we discuss the prejudice prong of the Strickland test, infra.

these witnesses therefore failed the <u>Strickland</u> test.  <u>Id.</u>  The district court concluded that these state court findings were not objectively unreasonable under <u>Strickland</u>, and we agree.

First, in considering the claim that counsel were ineffective, we note at the outset that our precedent does not impose an absolute duty on trial counsel to present mitigating or general character evidence.  <u>Chandler</u>, 218 F.3d at 1319 (en banc); <u>Stanley v. Zant</u>, 697 F.2d 955, 961 (11th Cir. 1983).  We explicitly refuse to find a "per se rule of law that a defense lawyer must present character witnesses at the sentencing phase."  <u>Chandler</u>, 218 F.3d at 1317 n.21 (en banc); <u>see</u> <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065 (rejecting the possibility of a "particular set of detailed rules for counsel's conduct" in assessing constitutionally effective assistance).  The decisions of both the Supreme Court and this court support the proposition that a counsel's performance can be constitutionally sufficient even where "no mitigating evidence at all was introduced."  <u>Waters v. Thomas</u>, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (citing cases).

Although no absolute duty exists to present mitigating evidence, we do hold that defense counsel must conduct a reasonable investigation.[48]  <u>Wiggins</u>, 539 U.S.

---

[48] Petitioner urges us, in assessing reasonableness, to adhere to the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) set forth by the American Bar Association (the "ABA Guidelines").  We decline to do so.  Although the

at 522–23, 123 S. Ct. at 2536; see Chandler, 218 F.3d at 1317 (en banc) ("[C]ounsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance."). In the instant case, petitioner's limited testimony at trial and his Rule 32 affidavit provide little insight, and the Rule 32 hearing – during which neither petitioner nor petitioner's trial counsel testified – offers us no window into the reasonableness of counsel's mitigation inquiry. See Rompilla, 545 U.S. at 389, 125 S. Ct. at 2467 (finding ineffective assistance of counsel where, during post-conviction proceedings, petitioner's trial counsel conceded that they failed to review a prior conviction file key to the prosecution's case); Wiggins, 539 U.S. at 531–34, 123 S. Ct. at 2540–42 (assessing the reasonableness of counsel's mitigation investigation on the basis of trial counsel testimony during post-conviction proceedings). We have neither post-conviction testimony from trial counsel nor relevant portions of the

ABA Guidelines suggest that "[i]t is necessary to locate and interview the client's family members . . . , and virtually everyone else who knew the client and his family," the Supreme Court has not made those standards the law of the land. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."). Despite the emphasis in Strickland on the optional character of the ABA Guidelines, id., we recognize that the Court itself has deemed the Guidelines useful in specific situations. See Wiggins v. Smith, 539 U.S. 510, 524, 123 S. Ct. 2527, 2536–37 (2003) (finding that the trial counsel's conduct "fell short" of the standards set forth in the ABA Guidelines). That said, the facts before us do not counsel the articulation of a per se rule that to render effective assistance, a defense counsel must always consult with the defendant's family members. See Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999).

35

trial transcript that might speak to whether the counsel's handling of the mitigation issue was, in fact, strategic.[49] That being the case, any conclusion concerning the reasonableness of counsel's performance would be pure guesswork – and we are hesitant to venture into the realm of speculation. We find that petitioner failed to carry his burden of proving that counsel provided constitutionally deficient assistance in failing to seek and present mitigating evidence during the penalty phase of the trial.

Second, even if we were to conclude that counsel's representation during the penalty phase of the trial was constitutionally insufficient, petitioner suffered no prejudice. During the Rule 32 post-conviction proceedings, petitioner's attorneys presented affidavits[50] from his three brothers, his common-law-wife, two sisters-in-law, petitioner himself, Dr. Shugerman, and attorney Cheryl Wilkinson-Simonetti. The substance of these affidavits was that the affiants would have testified on petitioner's behalf during the penalty phase, and specifically, would have vouched for petitioner's good character and stability before he succumbed to

---

[49] At trial, the only direct evidence of the defendant's trial strategy was a statement Wilkinson made at the close of the guilt phase, and outside the presence of the jury: "[T]he reason that I advised him against testifying is that he's got a prior conviction for robbery in particular, as well as a theft, which in this case I think would be terribly prejudicial and would spill over past credibility."

[50] We consider here both the affidavits that petitioner attached to his original Rule 32 petition as well as the affidavits presented during the Rule 32 hearing.

drugs.  In Strickland, the Supreme Court saw no merit in a petitioner's claim of ineffective assistance of counsel for failure to present mitigating evidence where the proposed evidence "would barely have altered the sentencing profile" and merely showed that "numerous people who knew [petitioner] thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress."  Strickland, 466 U.S. at 700, 104 S. Ct. at 2071.  Similar circumstances counsel a similar conclusion here.

Petitioner cites Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999), and Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991), where, according to petitioner, we found Strickland prejudice on "substantially similar mitigation evidence."[51] However, these cases are factually distinct.  In Collier, the mitigation evidence available was more substantial: petitioner's mother had died when he was young and his father had deserted him; he had overcome his learning disabilities to succeed in high school as a football star; he had worked to support himself as well as his aunt and uncle; he had cared for his aunt while she was dying of cancer; he was a devoted father and husband; he had lost his job prior to the crimes at issue; he had attempted to save someone's life; and he was moody when he had not taken diabetes medication.  Collier, 177 F.3d at 1200 n.20.

---

[51] We note that these cases pre-date AEDPA.

Likewise, although petitioner urges us to find <u>Strickland</u> prejudice in his case by analogizing to <u>Horton</u>, we are unpersuaded. In <u>Horton</u>, petitioner claimed ineffective assistance of counsel where the trial counsel failed to present the testimony of ten individuals who would have testified that he was a hard worker, a good provider for his common-law wife and daughter, and had adjusted well to prior stays in prison. <u>Horton</u>, 941 F.2d at 1463. There, we found prejudice because of counsel's failure to present that mitigating evidence <u>and</u> counsel's comments during closing argument[52] that "encouraged rather than discouraged the jury to impose the death penalty." <u>Id.</u> at 1462. We have no similar confluence of factors here.

We are even more reluctant to find <u>Strickland</u> prejudice given that two of the affiants whose testimony was adduced for the purposes of petitioner's Rule 32 proceedings were key State witnesses: Abbie Dill and her son Terry Dill. The State called Abbie Dill, petitioner's sister-in-law and Terry Dill's mother, during the guilt phase. Abbie Dill recounted statements by petitioner that placed him in a

---

[52] According to Horton's attorney, as told to the jury: "[T]he one you judge is not a very good person . . . I ask you for the life of a worthless man. . . . [The prosecutor's closing] made me hate my client. . . . [I]t becomes my turn to try and explain to you why you don't have to say he's got to die . . . [and] I find my task virtually impossible." <u>Horton</u>, 941 F.2d at 1462.

culpable light,[53] and indicated that petitioner had called her home numerous times seeking to speak with Terry Dill on the night of the shooting.[54]  Likewise, the State called Terry Dill to the stand as a key witness.  Terry Dill testified that he had seen petitioner take cocaine from the person of Leon Shaw after the shooting.  With these circumstances in mind, we do not find it prejudicial to petitioner that counsel did not elicit mitigating evidence from witnesses who were clearly testifying against petitioner's interests.  Any mitigating evidence Abbie Dill or Terry Dill might have offered at trial would have been weak, at best.

Given the weakness of the mitigating circumstances that petitioner presents, we are unpersuaded by his argument that such testimony would have surmounted the three aggravating factors[55] found by the trial court.  We agree with the state court that any failure of petitioner's trial counsel to investigate and present

---

[53] Abbie Dill recounted that petitioner called her a week prior to trial: "He said that he afraid and give all his dirty deeds or whatever he have done to the Lord, and nobody should punish him for what he has done."  And later: "He said to the fact that Terry should go on and not say anything and take some years or something to the fact of some years or whatever they going to give him.  And I said to him, I said why, Terry said he haven't did anything."

[54] Upon being asked by the State, "Do you have an opinion as to how many times [the defendant] called your house [between the hours of 5:00PM and 6:30PM]?", Abbie Dill replied, "It was so many times until I asked him what was wrong, and he said nothing."

[55] The three aggravating factors in this case are that: (1) the capital offense was committed by a person under sentence of imprisonment; (2) the defendant was previously convicted of a felony involving the use or threat of violence to the person; and (3) the capital offense was committed while the defendant was engaged in the commission of a robbery.

39

mitigating evidence during the penalty phase was not unreasonable, and moreover, petitioner was not prejudiced as a result. Petitioner's trial counsel did not offer constitutionally inadequate assistance in that regard.

## IV.

For the foregoing reasons, we hold that the district court properly denied petitioner's federal habeas relief on his ineffective assistance of counsel claims. The district court's order is therefore

AFFIRMED.